**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| LATASHA DAVIS and JENNIFER ELLIOTT, Individually and as representatives of a class of participants and beneficiaries in and on behalf of the WASHINGTON UNIVERSITY RETIREMENT SAVINGS PLAN, <br><br> Plaintiff, <br><br> vs. <br><br> WASHINGTON UNIVERSITY IN ST. LOUIS, <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT – CLASS ACTION** <br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

1.      Plaintiffs Latasha Davis and Jennifer Elliott, individually and as representatives of a class of participants and beneficiaries of the Washington University Retirement Savings Plan (the "Savings Plan") brings this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendant Washington University in St. Louis for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

2.      The duties of loyalty and prudence are among the highest known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries. As a fiduciary to the Plan, Defendant is obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent. Because the marketplace for retirement plan services is established and competitive, and because the Plan has billions of dollars in assets, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and

well-performing investment funds.

3.      But instead of leveraging the Plan's substantial bargaining power to benefit participants and beneficiaries, Defendant caused the Plan to pay unreasonable and excessive fees for investment and administrative services. Further, Defendant selected and retained investment options for the Plan that historically and consistently underperformed their benchmarks and charged excessive investment management fees.

4.      Rather than negotiating separate, reasonable, and fixed fees for recordkeeping, Defendant continuously retained investment choices and share classes that charged higher fees than other less expensive share classes that were available for the same investment fund.  As a result, plaintiffs paid an asset-based fee for administrative services that continued to increase with the increase in the value of a participant's account even though no additional services were being provided.

5.      Further, Defendant was responsible for regularly monitoring all the Plan's investment choices and for periodically reviewing and evaluating the entire investment choice menu to determine whether it provided an appropriate range of investment choices into which participants could direct the investment of their accounts.  Defendant, however, failed in those duties and retained certain investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive fees.

6.      Defendant selected as the Plan's principal capital preservation fund, an insurance company fixed-income account, the TIAA Traditional Annuity, that prohibited participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives

changed. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

7. One could reasonably infer from these circumstances alone that the Defendant's fiduciary decision-making process was either flawed or badly executed, but there is substantial additional evidence of a flawed process, such as (i) the inclusion of a dizzying array of thirty-five TIAA-CREF and more the eighty Vanguard investment options; and (ii) approval of a TIAA loan program that required excessive collateral as security for repayment of the loan, charged grossly excessive fees for administration of the loan, and violated U.S. Department of Labor ("DOL") rules for participant loan programs.

8. To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendant's personal liability under 29 U.S.C. §1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## I.   JURISDICTION AND VENUE

9. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

10. This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place and where the Defendant resides.

## II.  THE WASHINGTON UNIVERSITY RETIREMENT SAVINGS PLAN

11.     The Plan is defined contribution, individual account, employee pension benefit plan as defined under 29 U.S.C. §1002(2)(A) and §1002(34).

12.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

13.     Eligible faculty and staff members of Washington University are able to participate in the Savings Plan. The Savings Plan provides the primary source of retirement income for many employees of Washington University.   The Savings Plan is based upon deferrals of employee compensation and employer matching contributions.   The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by the Washington University net of fees and expenses.    Participants have the right to direct the investment of their accounts among the available investment choices

14.      Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion). With more than **$3.8 billion** in assets as of December 31, 2015, the Savings Plan amply qualifies as a "Mega" plan. The Savings Plan had more than 24,000 participants as of December 31, 2015.

## III.   THE PARTIES

### a.  **Plaintiffs**

15.     Plaintiff Latasha Davis, a resident of Fairview Heights, Illinois, is a participant in the Plan as defined under 29 U.S.C. §1002(7) because she has a vested account balance in the Savings Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Through the Plan she is invested in the TIAA Traditional Annuity, The CREF Stock Account, the

CREF Equity Index Account, the TIAA-CREF Large Cap Growth Index fund Real Estate Account, the CREF Inflation-Linked Bond Fund R3 and the TIAA-CREF Money Market Account.

16. Plaintiff Jennifer Elliott, a resident of Arnold, Missouri, is a participant in the Plan as defined under 29 U.S.C. §1002(7) because she has a vested account balance in the Savings Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Through the Plan she is invested in the TIAA Traditional Annuity, The CREF Stock Account, the CREF Equity Index Account, the TIAA Real Estate Account, CREF Inflation-Linked Bond Fund Account, CREF Bond Market Account, the TIAA-CREF Large Cap Growth Index fund, and several Vanguard funds.

b. **Defendant**

17. Washington University in St. Louis ("Washington University," the "University," or "Defendant") is a private, not-for-profit, nonsectarian institution of higher learning non-profit educational institution with its principal place of business in St. Louis, Missouri. The University is governed by a Board of Trustees.

18. Washington University is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

19. The University is a fiduciary to the Plan because it has exercised and continues to exercise discretionary authority or discretionary control respecting the management of the Plan

and the management and disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii). The University has acknowledged that it is the Plan Administrator in the Savings Plan's Summary Plan Description.

## IV.    FACTS APPLICABLE TO ALL COUNTS

### I. Plan investments

20.    Defendant exercised and continues to exercise discretionary authority over the investment options that are included in the Plan. The Plan's investments are designated by Defendant as available investment alternatives offered under the Plan.

21.    The Plan offers twenty-six investment choices managed by the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), including variable annuities, registered investment companies and a pooled separate account.

22.    The Savings Plan also offers eighty-three investment choices managed by The Vanguard Group and/or Vanguard Fiduciary Trust Company ("Vanguard"), which are all mutual funds.

23.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

24.    The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, for participants who invest in the TIAA Traditional Annuity through a Group Retirement Annuity (GRA) contract, like

the one held in the Plan, lump-sum withdrawals are available from the Traditional Annuity only within 120 days after termination of employment and are subject to a 2.5% surrender charge. All other withdrawals and transfers from the account must be paid in ten annual installments. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without a substantial penalty can only do so over ten years.

25.     The Plan's CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

26.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges.  For the R1 share class, which was the only share class available prior to 2015, those expenses consisted of the following:

a. "administrative expense" charge (39.5 bps); [1]

b. "distribution expense" charge (16.5 bps);

c. "mortality and expense risk" charge (0.5 bps); and

d. "investment management expense" charge (ranging from 4 to 15 bps).

27.     The TIAA Real Estate Account is an insurance company separate account

[1] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

     a. "administrative expense" charge (26.5 bps);

     b. "distribution expense" charge (12.5 bps);

     c. "mortality and expense risk" charge (0.5 bps);

     d. "liquidity guarantee "(17 bps); and

     e. "investment management expense" charge (32 bps).

28.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

**II.    Defendant's actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

29.    Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to jumbo defined contribution plans, like the Plan. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

30.    To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans solicit

competitive bids for the plan's recordkeeping and administrative services at regular intervals of approximately five years.

31. The cost of recordkeeping and administrative services depends on the number of participants. The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

32. Mega or jumbo defined contribution plans, like the Plan, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

33. A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper—that is, recordkeeping expense calculated as a percentage of total plan assets—prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary must ensure that the recordkeeper

rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

34.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages all plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

35.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).[2]

36.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.

> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov.

---

[2] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/New s_Center/Reports/130329-01exec.pdf.

2009)(emphasis in original).[3]

37.     The benefits of using a single recordkeeper are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[4]

38.     In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", Aon Hewitt similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, *How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[5]

39.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average

---

[3] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.
[4] *Id.*
[5] Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plan_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[6]

40.　　Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[7] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[8]　Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the

---

[6] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[7] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[8] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[9]

41.　　Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendant continues to contract with *two* recordkeepers (TIAA-CREF and Vanguard). The inefficient and costly structure maintained by Defendant has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There is no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Plan or to continue with two recordkeepers to the present.

42.　　The Savings Plan offers a dizzying array of investment choices, with more than forty investment options offered by TIAA-CREF, a number of which are in the form of annuity contracts, and eighty-three investment funds offered by Vanguard.

43.　　Each of the Plan's recordkeepers received or currently receives compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plan and its investments for providing these duplicative services.

44.　　Upon information and belief and according to industry experts and the prospectus for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments prior to 2014 were:

| TIAA-CREF Investment | Revenue Share |
| --- | --- |
| CREF variable annuity contracts | 56 bps |

---

[9] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

| Premier share class of TIAA-CREF mutual funds | 15 bps |
|---|---|
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15 bps |

45. Vanguard is compensated for recordkeeping services based on internal revenue sharing it receives from their mutual funds sold to the Plan.

46. In addition, the Plan's recordkeepers receive additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

47. Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Plan would have been a fixed amount between $500,000 and $850,000 (approximately $35 per participant with an account balance).

48. An examination of the prospectuses for the TIAA and CREF funds available as investment choices and the Plan' financial data, it is clear that the Plan paid at least hundreds of dollars per participant per year from 2010 to 2015 for recordkeeping; much higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

49. Based on calculations derived from examination of the Plan' 5500's, TIAA received indirect compensation for recordkeeping and administrative services of $8.4 million from only the CREF variable annuities, the TIAA CREF Real Estate Account, and the TIAA Traditional Annuity, without regard to any other indirect compensation received from, for example, plan loans and revenue sharing from the TIAA mutual funds. None of this indirect compensation was

reported on any of the Savings Plan's Annual Returns filed with the U.S. Department of Labor ("DOL") Employee Benefit Security Administration ("EBSA") on Form 5500, in violation of the explicit obligation to do so under federal law.

50.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The EBSA has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[10]

51.     Defendant also failed to control recordkeeping costs as Plan assets grew. From December 31, 2009, to December 31, 2014, the Plan's assets increased by nearly 60% from $2.4 billion to $3.8 billion. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other loyally and prudently administered plans do, but failed to do so.

52.     Defendant failed to prudently monitor and control the compensation paid by the Plan for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers. Had Defendant monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings in the last six years alone.

53.     Annual Returns on Form 5500 provide substantial evidence of that failure. The

---

[10] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

Plan's 5500's are essentially the Plan's annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in connection with those services. None of the Savings Plan's 5500's filed since 2009 disclose any amount of indirect compensation being received by TIAA. In fact, the first time the 5500 for the Savings Plan indicated that TIAA even acknowledged receiving any direct or indirect compensation for recordkeeping services was for the 2011 Plan Year. Whether these egregious reporting errors were caused by TIAA's reporting deficiencies or by Washington University's misrepresentation of TIAA's accurate reporting, the implication is the same—Washington University failed in its obligations to the Plan and its participants.

54.     Further evidence of the carelessness of Washington University in the exercise of its fiduciary obligations is provided by the participant fee disclosure required by 29 CFR 2550.404(a)(5) to be delivered annually to each participant; a disclosure provided by TIAA. Among other information, the disclosure must provide an historical record of the investment return for the fund as well as the "expense ratio," which is the aggregate expense investors pay for investing in the fund and stated in "basis points" as a percentage of the amount invested. A basis point is one one-hundredth of one percent, so that an expense ratio of 50 basis points, for example, charges 0.5% as a fee for investing.

55.     As previously alleged, participants can choose to invest in the TIAA funds or in a variety of funds offered by Vanguard. The participant fee disclosure includes investment return and expense information for the Vanguard funds as well as the TIAA funds. The reporting for the Vanguard funds, however, does not appear to be accurate. The following table provides a significant sample of the available Vanguard funds with their corresponding expense ratios as reported in the respective fund's prospectus and as reported by TIAA in a recent participant fee

disclosure and differences in the reporting of one to four basis points as specified in the following table:

| Washington University Retirement Savings Plan— Vanguard Fund Reported Expense Ratios | | | |
|---|---|---|---|
| Fund | Expense from Prospectus | Expense Reported by TIAA | Differential |
| Emerging Markets Stock Index Fund | 32 | 33 | 1 |
| Equity Income Fund I | 26 | 26 | 0 |
| Explorer Fund | 46 | 49 | 3 |
| Growth Index Fund | 22 | 23 | 1 |
| Growth and Income Fund | 34 | 34 | 0 |
| Health Care Fund | 36 | 34 | -2 |
| International Explorer | 41 | 42 | 1 |
| International Growth Fund | 46 | 47 | 1 |
| Mid-Cap Index Fund | 20 | 23 | 3 |
| Mid-Cap Growth Index | 20 | 23 | 3 |
| Mid-Cap Value Index | 20 | 23 | 3 |
| Morgan Growth Fund | 38 | 40 | 2 |
| REIT Index Fund | 26 | 26 | 0 |
| PRIME CAP | 32 | 34 | 2 |
| Selected Value Fund | 35 | 39 | 4 |

| | | | |
|---|---|---|---|
| Small-Cap Index Fund | 20 | 23 | 3 |
| Intermediate Term Bond Index | 16 | 20 | 4 |
| Long-Term Bond Index | 16 | 20 | 4 |
| Short-Term Bond Index | 16 | 20 | 4 |
| Total Bond Market Index Fund | 16 | 20 | 4 |
| Total International Stock Index Fund | 18 | 19 | 1 |
| U.S. Growth Fund | 46 | 47 | 1 |
| Wellesley Income Fund | 22 | 23 | 1 |
| Windsor II Fund | 33 | 34 | 1 |

56. This rather extensive reporting error demonstrates the cavalier attitude with which the University approached its fiduciary duty to give participants accurate information about plan investments. It should have been uncovered and corrected.

57. But even worse, if it turns out that the participant fee disclosure is correct, that TIAA was padding the bill, and overcharging participants who chose the Vanguard funds over the TIAA funds, the University would never know.

58. With respect to Vanguard funds, as of April 2017, Defendant provided approximately 83 investment options in Vanguard mutual funds. Such funds include asset classes such as bond funds, balanced funds (stocks and bonds), domestic stock funds, international stock

funds, and specialty stock funds like real estate.

59. The Plan's Vanguard fund offerings include both retail "investor" share classes and "institutional" (or Admiral, depending on the fund) share classes of mutual funds. The retail share classes of mutual funds are designed for small individual investors, not large defined contribution retirement plans like the Plans, and are identical in every respect to institutional share class funds, except for much higher fees.

60. Of the 83 Vanguard funds available to Plan investors, for 41 of those choices, the Defendant has designated only the retail "investor" share class as available investment alternatives offered under the Plans. Of the other 42 available Vanguard funds offered by the Plans, either Admiral shares are offered with substantially lower fees or the funds offer only one share class.

61. As shown by the sampling of those funds in the table below, Defendant could have designated the institutional share class for the designated investment options, as opposed to investor share classes, at substantially lower cost to Plan participants. Such institutional class funds are available to large investors like the Plans.

62. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds, "Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup of Vanguard Institutional Target Retirement Funds and/or Vanguard Target Retirement Funds." Thus, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plans' sizes, if requested, the investment provider would make available lower-cost share classes for the Plans, if there were any fund that did not individually reach the

threshold.

63.     There is no rational basis for selecting institutional class shares for 17 of the investment choices and investor class shares for the remaining 70. If a selection of share class was intended to offset the cost of recordkeeping, it was an exceedingly poor decision, considering the amounts being collected by TIAA for recordkeeping services. Despite the availability of these far lower-cost options, Defendant selected and continues to retain investment options with far higher costs. The following table lists examples of the Plans' designation of investor as opposed to lower-cost institutional classes as investment options with respect to Vanguard mutual funds:

| EXPENSE RATIO COMPARISON: Vanguard Investor Shares vs. Institutional Shares | | | |
|---|---|---|---|
| **INVESTOR SHARES OFFERED BY THE PLANS** | **EXPENSE RATIO** | **INSTITUTIONAL SHARES, FOR THE SAME FUNDS, NOT OFFERED BY THE PLANS** | **EXPENSE RATIO** |
| **Bond Funds** | | | |
| Inflation-Protected Securities Inv. (VIPSX) | 0.20% | Inflation-Protected Securities Institutional Shares (VIPIX) | 0.07% |
| Total Bond Market Index Investor shares (VBMFX) | 0.15% | Total Bond Market Index Admiral Shares (VBTLX) | 0.05% |
| Short-Term Federal Fund-Inv (VSGBX) | 0.16% | Short-Term Federal Fund – Admiral  (VSGDX) | 0.06% |
| Long-Term Investment-Grade-Inv (VFICX) | 0.20% | Long-Term Investment-Grade-Adm (VFIDX) | 0.10% |
| Short-Term Treasury Fund - Inv (VFISX) | 0.20% | Short-Term Treasury Fund - Adm (VFIUX) | 0.10% |
| **Balanced Funds** | | | |
| Vanguard Life Strategy Investor (VTWNX) | 0.14% | Vanguard Life Strategy Investor (VITWX) | 0.10% |
| Vanguard Wellesley Income Fund (VWINX) | 0.22% | Vanguard Wellesley Income Fund (VWIAX) | 0.15% |
| Vanguard Balanced Index Fund Investor Shares | 0.22% | Balanced Index Fund Institutional Shares (VBAIX) | 0.07% |

| (VBINX) | | | |
|---|---|---|---|
| **Stock Funds** | | | |
| Vanguard Dividend Growth Investor (VDIGX) | 0.30% | Vanguard Dividend Growth Institutional (VIGIX) | 0.05% |
| Vanguard FTSE Social Index Fund Investor Shares (VFTSX) | 0.22% | FTSE Social Index Fund Institutional Shares (VFTNX) | 0.12% |
| Vanguard Small-Cap Growth Index Fund Investor Shares (VISGX) | 0.20% | Small-Cap Growth Index Fund Institutional Shares (VSGIX) | 0.07% |
| Vanguard 500 Index Fund (VFINX) | 0.14% | Vanguard 500 Index Fund Institutional Shares (VFIAX) | 0.04% |
| **International** | | | |
| Vanguard International Growth – Inv (VWIGX) | 0.46% | Vanguard International Growth -Inst (VWILX) | 0.33% |
| Vanguard European Stock Index-Inv (VEURX) | 0.26% | Vanguard European Stock Index-Inst (VESIX) | 0.08% |

64.     It is not yet clear to Plaintiffs what the additional fees paid to Vanguard actually paid for, since it appears that TIAA is the sole recordkeeper.

**V.     Defendant imprudently retained historically underperforming Plan investments.**

65.     Given Defendant's failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plan.

**a. CREF Stock Account**

66.     Investments in the CREF Stock Account as of December 31, 2015, represent roughly 16.8 percent of the Plan's assets, and the CREF Stock Account has been included as an investment option in the Plan from at least 2009 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has for years historically underperformed

and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

67. TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. Prior to creation of three separate share classes for the CREF Stock Account in mid-2015, the CREF Stock Account paid 56 bps for revenue sharing as administrative expense and "distribution fees", which exceeded other TIAA-CREF investments by over 50% (15 bps).

68. Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

69. Defendant failed to undertake such analysis when it selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendant also provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and

active managers do not outperform passive managers net of fees in this investment style.

70.     Had such an analysis been conducted by Defendant, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

71.     Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendant and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



**CREF Stock Account
One-, Five-, and Ten-Year Investment Returns
Compared to Benchmarks
(as of Dec. 31, 2014)**

72.    The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

73.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



**CREF Stock Account
One-, Five-, and Ten- Year Investment Returns
Compared to Actively Managed Benchmarks**
(as of Dec. 31, 2014)

73%–196%
greater than
CREF return

28%–37%
greater than
CREF return

20%–56%
greater than
CREF return

■ CREF Stock Account   ■ VDEQX   ■ VPMAX   ■ VHCAX

74.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[11]

---

[11] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.







75.     Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

76.     Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[12] This recommendation was due to numerous factors, including the historical

--------------------------------

[12]     Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. Id. at 4–5.

77. The Supreme Court recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plan and the opinion of one of the foremost authorities in the retirement investment industry that ***no*** retirement plan should own this fund.

78. Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

79. Had the Defendant removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth in ¶¶97 and 99, Plan participants would not have lost millions of dollars' worth of their retirement savings.

**B.      TIAA Real Estate Account**

80. Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plan. The fund has far greater fees than are reasonable, has

historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

81.     With an expense ratio of 88.5 bps as of December 31, 2014, the TIAA Real Estate Account is nearly eleven times more expensive than the Vanguard REIT Index (Inst), which has an expense ratio of 8 bps.



82.     Simply stating the expense ratio does not tell the whole story of fund expenses. TIAA disclosures indicate that included in the TIAA Real Estate Account's investment management fees is the expense of an independent fiduciary that is retained to approve appraisers of the Account's assets, ensure that acquisitions meet the Account's investment guidelines, and various other aspects of the operation of the Account that are and should be the obligations of

TIAA as the fund manager. In fact, TIAA selects the appraisers and the funds' investments, and determines all other matters relating to the management of the fund that are then subject to the approval of the independent fiduciary. The reason, however, that the Account needs the services of an independent fiduciary is to ensure that TIAA, as the manager of the fund, does not engage a variety of prohibited transactions, including self-dealing transactions. By obtaining the approval of the independent fiduciary, TIAA is able to engage in transactions with parties-in-interest, including related parties, which it otherwise could not engage in. In other words, the independent fiduciary is required in order to allow TIAA to actually manage the Real Estate Account and offer it as an investment choice to retirement plans. It is an expense that should be borne entirely by TIAA as a cost of engaging in the business, not a legitimate expense of the operation of the fund.

83. The TIAA Real Estate Account had a long history of substantial under-performance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009. Despite this, Defendant selected and continues to retain it in the Plan.



**TIAA Real Estate Account
Ten-Year Investment Returns Compared to
REIT Index Fund (VGSNX)**
(as of Dec. 31, 2009)

239% greater than TIAA return

12%
7%
2%

10 Year

■ TIAA Real Estate Account    ■ VGSNX

84.     This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.



85. The very design of the TIAA Real Estate Account creates such operational difficulties, and burdens investors in the fund with such significant additional expense, that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment at all for participant-directed individual account plans like the Plans.

86. The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from the Employee Benefit Security Administration of the DOL just to be able to offer the fund as an investment choice to ERISA

plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

87.     Additionally, the fund invests directly in real property assets that are highly illiquid. In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but charges participants an additional 17 basis points for that liquidity guarantee.

88.     The Real Estate Account charges participants 29.5 basis points for recordkeeping expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points.  A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

89.     Finally, the Real Estate Account has and continues to charge 12.5 basis points for "distribution fees."  Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA.  The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

90.     The Real Estate Account's poor performance coupled with 44.5 basis points in excessive fees makes the TIAA Real Estate Account an exceedingly poor choice by any measure and speaks for itself in evaluating the performance of Defendant's fiduciary obligation to act solely in the best interest of participants for the exclusive purpose of providing them benefits under the

Plans.

91.     As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, the Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

92.     Had Defendant removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plan participants would not have lost millions of dollars' worth of their retirement savings.

**B.     TIAA Non-Benefit Responsive Traditional Annuity**

93.     The TIAA Non-Benefit Responsive Traditional Annuity prohibits participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives changed. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

94.     The TIAA Traditional Annuity is an insurance company general account product, meaning that all of the assets supporting the annuity contract are held in TIAA's general account, and invested along with all the other assets in TIAA's general account.  All of the assets of the TIAA general account are available to support the obligations of the Traditional Annuity.

95.     One of the fundamental requirements of ERISA is that every contract or agreement between a plan and an investment manager like TIAA is that no contract or arrangement is

reasonable within the meaning of section 408(b)(2) of ERISA if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

96.     As expressly noted in 29 CFR 2550.408b-2(c)(3), a provision in a contract or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination of the contract, arrangement, or lease is not a penalty. For example, a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty. Similarly, a provision in a lease for a termination fee that covers reasonably foreseeable expenses related to the vacancy and re-letting of the office space upon early termination of the lease is not a penalty. Such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation of damages.

97.     The 2.5% surrender charge imposed by the TIAA Traditional Annuity on lump sum withdrawals completely fails to take into account the financial conditions of the TIAA general account and is a clear and patent violation of the prohibition on a penalty for early withdrawal from the contract.  Suppose, for example, that in connection with the investment of participant accounts in the Traditional Annuity, TIAA acquired long-term bonds paying an interest rate of 4%, and that Plaintiff Latasha Davis has invested in the Traditional Annuity for twenty years before her retirement.  If, at her retirement, those bonds have increased in value by 10% due to changes in prevailing interest rates, and Latasha requests a lump sum distribution, TIAA could easily sell those bonds at a profit and pay Latasha her lump sum distribution.  Instead, getting a lump sum distribution will cost Latasha a 2.5% surrender charge, ostensibly to protect TIAA from a loss it would not incur.  A surrender charge that is always imposed for the life of a contract, regardless of the term of a participant's investment in the contract and regardless of the financial condition

of TIAA's general account at the time of withdrawal is *per se* unreasonable because it will invariably result in charges that are wholly unrelated to any actual loss.

98.     To have accepted these conditions for the investment of plan assets indicates that either (i) Defendant failed in its obligation to thoroughly understand the terms of the contract or (ii) failed to act in the best interest of plan participants in accepting such unreasonable terms.

99.     Even if the Defendant was blissfully and excusably unaware of the nature of the surrender change at the time of the initial investment in the contract, the DOL's release of its final regulation under ERISA § 408(b)(2), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure* (the "408b-2 Disclosure Rule"), on February 2, 2012 should have alerted it to issue.

100.    Release of the 408b-2 Disclosure Rule was a big deal. No reasonable responsible plan fiduciary could have missed it, since it required affirmative compliance of virtually every plan service provider and fiduciary by July 2012.

101.    As noted above, the 408b-2 Disclosure Rule contains an express provision in 29 CFR 2550.408b-2(c)(3) addressing the requirement for contacts to be terminable on reasonably short notice without penalty. In fact, insurance companies discussed the issue of surrender charges with the DOL prior to the issuance of the final rule. As noted in the Preamble to the Interim Final Rule:

> *Other commenters raised questions as to whether certain fees and market value adjustments, generally associated with insurance or insurance-type services and investments, constitute "penalties" for purposes of this paragraph of the regulation*. The regulation provides specifically that "a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty." *The Department believes that questions as to whether, for any particular contract, the charges for contract termination are in fact "penalties," rather than a service provider's recoupment of reasonable start-up costs, are inherently factual questions; accordingly, the Department did not amend the rule in response to these comments.* After consideration of all of the comments on paragraph (c )(2) of the proposal, the Department has determined to adopt that paragraph, without change, in the interim final rule, except that this provision has been moved to a new paragraph (c )(3) of the interim final rule.

(Emphasis added.)

102.    Accordingly, the very existence of a 2.5% surrender charge that never varies regardless of the financial consequence of the withdrawal is unreasonable, and the acceptance of such terms, a breach of fiduciary duty.

## ERISA'S FIDUCIARY STANDARDS

103.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as fiduciary of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

104.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

105.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

106.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant

part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>>
>> (2)   if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>>
>> (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

107.   29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

108.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109(a).

109.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as

a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of The Washington University Retirement Savings Plan from April 28, 2011, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plan.

110.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 24,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the time period at issue in this action and all participants in the Plan were harmed by Defendant's misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

111. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

112. Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

**COUNT I**

**Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees**

113.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

114.    The scope of the fiduciary duties and responsibilities of the Defendant includes discharging its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA. Defendant is directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

115.    Defendant selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

116.    For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

117.    Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

118.    Defendant's failure to properly evaluate the reasonableness of amounts being

charged to the Plans have caused Plaintiffs and the Class millions of dollars in direct economic loss. The Plans' total losses will be determined after complete discovery in this case and are continuing.

119.    Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

**Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses**

120.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

121.    The scope of the fiduciary duties and responsibilities of the Defendant includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendant is directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

122.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

123.    Defendant selected and retained as Plan investment options investment funds and insurance company annuities with far higher expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

124.     Rather than consolidating the Plan's many investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendant retained duplicative investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower-cost share classes of certain investments.

125.     Defendant failed to engage in a prudent process for the selection and retention of Plan investment options. Rather, Defendant used more expensive funds with inferior historical performance than investments that were available to the Plan.

126.     <u>CREF Stock Account</u>: Defendant selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and <u>actively managed investments with similar underlying asset allocations.</u>

127.     <u>TIAA Real Estate Account</u>: Defendant selected and retained the TIAA Real Estate Account for the real estate investment in the Plan despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

128.     <u>TIAA Traditional Annuity</u>: Defendant failed to thoroughly evaluate the surrender charges imposed on plan participants wishing to take a lump sum distribution or worse, knowingly saddled participants with severe restrictions on their ability to withdraw from the Traditional Annuity, even at retirement, without the imposition of a penalty.

129.     Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and their participants, and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

130.     Total Plan losses will be determined after complete discovery in this case and are continuing.

131.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**COUNT III**

**Prohibited Transaction – Lending of Money or Other Extension of Credit Between a Plan and a Party in Interest**

132.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

133.     ERISA § 406(a)(1)(B), 29 U.S.C. §1106(a)(1)(B), provides that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

134.     Defendant is a fiduciary responsible for arranging for and administering the participant loan program with respect to the Plans.

135.     Defendant is a fiduciary responsible for determining the interest rate for participant loans, for transferring assets from the accounts of participants who take loans from their retirement accounts to the Defendant's Traditional Annuity or to a Retirement Loan certificate, and for determining the interest rate participants will receive on their loan "collateral" invested in the Traditional Annuity or in Retirement Loan certificate.

136.     By accepting and approving the design and administration of a loan program in a manner intended to benefit TIAA, a party in interest to the Plans, at the expense of Plaintiffs and

Class members, violated its duty of loyalty set forth in ERISA § 404(a).

137.    By accepting and approving the design and administration of a loan program that violated the conditions for the exemption available for plan loans set forth in 29 CFR 2550.408b-1, Defendant has caused the Plans to engage in prohibited transactions in violation of ERISA § 406(a).

138.    Defendant is liable under 29 U.S.C. §1109(a) to make good to Plaintiffs and the Class losses resulting from the prohibited transactions alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT IV

### Prohibited Transaction – Transfer of Plan Assets to or for the Use of a Party in Interest

139.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

140.    ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), prohibits a plan fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect… transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

141.    ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) provides that a "party in interest" includes "a person providing services to [a] plan."

142.     TIAA is a party in interest with respect to Plaintiffs, the Plan, and the Class, providing record keeping, custodial, and other investment and administrative services to the Plan.

143.    The requirement that participants in the Plan must transfer a portion of a their accounts to TIAA as security for repayment of a plan loan constitutes a prohibited transfer of plan

assets to or for the use and benefit of TIAA, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

144.    By requiring that the Plaintiffs and Class members transfer a portion of a their retirement savings to TIAA as security for repayment of a participant loan, as a result of which TIAA will earn the spread between the interest charged to the participant for the loan and the interest paid by TIAA to the plan participant through the Traditional Annuity or the Retirement Loan certificate, Defendant is causing the Plans to transfer plan assets to or for the use and benefit of a party in interest in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

145.    Defendant is liable under 29 U.S.C. §1109(a) for all losses to Plaintiffs and Class members resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

• Find and declare that the Defendant has breached its fiduciary duties as described above;

• Find and adjudge that Defendant is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

• Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plan to include only prudent investments;

• Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

• Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Edgar Law Firm LLC, Schneider Wallace Cottrell Konecky Wotkyns LLP, and Berger & Montague P.C. as Class Counsel;

• Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.


Dated: June 8, 2017                    Respectfully Submitted,


*/s/ John F. Edgar*
John F. Edgar        # 47128
Matthew T. Swift      # 63601
EDGAR LAW FIRM LLC
1032 Pennsylvania Ave.
Kansas City, MO 64105
Telephone:     (816) 531-0033
Facsimile:      (816) 531-3322
Email: jfe@edgarlawfirm.com
Email: mts@edgarlawfirm.com

John J. Nestico*
Garrett W. Wotkyns*
Michael McKay*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com
jnestico@schneiderwallace.com

Todd Schneider*
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

Todd S. Collins*
Shanon J. Carson*
Ellen T. Noteware*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Attorneys for Plaintiffs*

*Pro Hac Vice application forthcoming