**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| LATASHA DAVIS, JENNIFER ELLIOTT, and MARLA ALIECE SIMS-KING, Individually and as representatives of a class of participants and beneficiaries in and on behalf of the WASHINGTON UNIVERSITY RETIREMENT SAVINGS PLAN,<br><br>        Plaintiffs,<br><br>vs.<br><br>WASHINGTON UNIVERSITY IN ST. LOUIS and WASHINGTON UNIVERSITY IN ST. LOUIS BOARD OF TRUSTEES,<br><br>        Defendants. | Civil Action No. 4:17-CV-01641-RLW<br><br>JURY TRIAL DEMANDED |

## CONSOLIDATED CLASS ACTION COMPLAINT

1.      Plaintiffs Latasha Davis, Jennifer Elliott, and Marla Aliece Sims-King, individually and as representatives of a class of participants and beneficiaries of the Washington University Retirement Savings Plan (the "Savings Plan" or the "Plan"), bring this action under 29 U.S.C. § 1132(a)(2) and (3) on behalf of the Plan against Defendant Washington University in St. Louis ("Washington University" or the "University") and the Washington University in St. Louis Board of Trustees ("Board of Trustees"; collectively with the University, "Defendants") for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA").

## I.    INTRODUCTION

2.      Every year, millions of employees entrust their retirement savings to retirement plans established under ERISA. ERISA plans are protected by their fiduciaries, who are

obligated to act prudently and loyally to protect the participants.  Failures by ERISA fiduciaries have stark financial consequences for the participants. Every extra point of expenses imposed upon participants and every underperforming investment option compounds over time, draining the value of participants' investments available upon retirement.

3.     The Plan is one of the largest § 403(b) defined contribution retirement savings plans in the country with approximately 24,000 participants and $3.8 billion in assets as of December 31, 2015.  The fiduciaries to the Plan utterly abdicated their fiduciary duties to act prudently and loyally.  Instead, they turned the Plan over to the Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA" or "TIAA-CREF") and Vanguard Group, Inc. ("Vanguard"). TIAA poured the Plan's funds into certain duplicative, expensive and underperforming TIAA propriety products, and TIAA and Vanguard reaped multiple layers of fees. The Plan and its participants lost the potential growth their investments could have achieved had the Defendants properly discharged their fiduciary duties.

4.     The duties of loyalty and prudence are among the highest duties known to the law and require fiduciaries to perform their obligations solely in the best interests of the participants and beneficiaries. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent. Because the marketplace for retirement plan services is established and highly competitive, and because the Plan has billions of dollars in assets, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing investment options.

5.     But instead of leveraging the Plan's substantial bargaining power to benefit participants and beneficiaries, Defendants caused the Plan to pay unreasonable and excessive

- 2 -

fees for investment and administrative services. Further, Defendants selected and retained investment options for the Plan that historically and consistently underperformed their benchmarks and charged excessive investment management fees.

6.      Rather than negotiating separate, reasonable, and fixed fees for recordkeeping, Defendants continuously retained share classes of Plan investment options that charged higher fees than other less expensive share classes that were available for the same fund.  As a result, Plaintiffs paid an asset-based fee for administrative services that continued to increase with the increase in the value of a participant's account even though no additional services were being provided.

7.      Additionally, Defendants, as fiduciaries, have attempted to insulate themselves from liability by the simple expedient of including a very large number of investment alternatives in the Plan's portfolio and then shifting to the participants the responsibility for choosing among them; a practice the U.S. Department of Labor ("DOL") has described as obvious, even reckless, imprudence in the selection of investments for a plan. As if this large number of options is not confusing enough for participants, Defendants' and the Plan service providers' Plan materials and documents conflict and do not provide participants with a clear picture of what is available in the Plan insofar as investment products are concerned. For example, the Plan participant fee disclosures identify over 160 investment options, whereas Forms 5500 make clear that during the Class Period, there are roughly 115-120 investment options on the Plan investment menu.

8.      Further, Defendants were responsible for regularly monitoring all of the Plan's investment choices and periodically reviewing and evaluating the Plan investment menu to determine whether it provided an appropriate range of investment choices into which participants could direct the investment of their retirement dollars. Defendants, however, failed in those

- 3 -

duties.

9.      Defendants selected as the Plan's principal capital preservation fund an insurance company fixed-income account—the TIAA Non-Benefit Responsive Traditional Annuity (the "Traditional Annuity")—that prohibited participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives changed. The Traditional Annuity also prohibited participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they paid a 2.5% surrender charge that bore no relationship to any reasonable risk or expense to which the fund was subject.

10.      One could reasonably infer from these circumstances alone that the Defendants' fiduciary decision-making process was either flawed or badly executed, but there is substantial additional evidence of a flawed process, such as (i) the inclusion of a dizzying array of about 35 investment options from TIAA and more than 80 investment options from Vanguard; and (ii) approval of a TIAA loan program that required excessive collateral as security for repayment of the loan, charged grossly excessive fees for administration of the loan, and violated U.S. Department of Labor ("DOL") rules for participant loan programs.

11.      As a result of Defendants' breaches of their fiduciary duties, Plan participants were damaged because, among other things:

> a. They paid higher recordkeeping fees than necessary, because Defendants permitted TIAA and Vanguard to charge such fees based on a percentage of assets invested instead of based on the number of plan participants;

b.  With respect to many funds, they paid the higher "retail" investment class fees paid by small investors even though, based on the size of the Plan, lower-fee class versions of the identical fund (with the same fund manager) were available to the Plan; and

c.  They were burdened with many duplicative funds, including poorly-performing funds, "bundled" into the Plan by TIAA and Vanguard mandates, which resulted in higher fees and/or poorer investment returns, thereby enriching TIAA and Vanguard at the expense of Plan participants.

12.  To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

13.  The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including but not limited to review of Plan filings with the United States Department of Labor ("DOL"), other publicly available documents, documents provided to Plaintiffs as Plan participants, documents supplied to Plaintiff Sims-King at the express request of her counsel, and other analytical investment data. As Plan fiduciaries, Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials become available during the course of this litigation.

## II.       JURISDICTION AND VENUE

14.       This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

15.       This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where  Defendants reside.

16.       Plaintiffs have standing to bring this lawsuit on behalf of the Plan under § 1132(a)(2). The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Section 1132(a)(2) authorizes any participant to sue as a representative of the Plan to seek relief on behalf of the Plan. An ERISA plan participant has standing to sue on behalf of the Plan and all Plan participants under Section 1132(a)(2) even where the participant is not invested in each and every investment offered within the Plan. As explained in detail below, the Plan suffered millions of dollars in losses and harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

## III.      THE WASHINGTON UNIVERSITY RETIREMENT SAVINGS PLAN

17.       The Plan is defined contribution, individual account, employee pension benefit plan as defined under 29 U.S.C. § 1002(2)(A) and § 1002(34). A defined-contribution plan is a retirement plan in which the value of a participant's retirement accounts is determined solely by (and thus limited to) employee and employer contributions plus the amount gained through investment in the options made available in the plan (less expenses). Employees contribute a percentage of their pre-tax earnings to the Plan through an individual account, which is invested

in investment options selected by the Plan's fiduciaries. In the Plan, Washington University matches employee contributions at the rate of 7%-11.5%, depending on factors including date of hire and length of service.

18.     The majority of fees assessed to the Plan's participants are attributable to two general categories of services: plan administration (including recordkeeping) and investment management. These expenses significantly reduce the value of an account in the Plan. The Plan fiduciaries control plan expenses, including those associated with the service providers selected and hired to administer the Plan (*e.g.*, recordkeepers). The Plan fiduciaries are also responsible for negotiating and approving fees paid to the Plan service providers, whether directly or indirectly paid. The Plan fiduciaries control the menu of investment options offered in the Plan. Investment selections each have their own fees, which are deducted from the returns that participants receive on their investments.

19.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

20.     The Savings Plan provides the primary source of retirement income for many employees of Washington University. The ultimate retirement benefit provided to Plan participants depends on the performance of investment options chosen for the Plan by Defendants, net of fees and expenses. Participants have the right to direct the investment of their accounts among the available investment choices.

21.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million), "Mid" plans ($50-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion). With nearly $3.8 billion in assets and more than 24,000 participants as of December 31, 2015, the Savings

Plan amply qualifies as a "Mega" or "Jumbo" plan.

## IV.   THE PARTIES

### A.   Plaintiffs

22.      Plaintiff Latasha Davis, a resident of Fairview Heights, Illinois, is a participant in the Plan as defined under 29 U.S.C. § 1002(7), because she has a vested account balance in the Savings Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Through the Plan she is currently invested, or during the Class Period was invested, in the TIAA Traditional Annuity, the CREF Stock Account, the CREF Equity Index Account, the TIAA-CREF Large Cap Growth Index Fund, the TIAA Real Estate Account, the CREF Inflation-Linked Bond Account R3 and the TIAA-CREF Money Market Account.

23.      Plaintiff Jennifer Elliott, a resident of Arnold, Missouri, is a participant in the Plan as defined under 29 U.S.C. § 1002(7), because she has a vested account balance in the Savings Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Through the Plan she is currently invested, or during the Class Period was invested, in the TIAA Traditional Annuity, the CREF Stock Account, the CREF Equity Index Account, the TIAA Real Estate Account, the CREF Inflation-Linked Bond Account, the CREF Bond Market Account, the TIAA-CREF Large Cap Growth Index fund, and several Vanguard funds.

24.      Plaintiff Marla Aliece Sims-King, a resident of  St. Louis, Missouri,  is a participant in the Plan under 29 U.S.C. § 1002(7), because she has a vested account balance in the Savings Plan and her beneficiaries are or may become eligible to receive benefits under the Plan. Through the Plan she is currently invested, or during the Class Period was invested, in the TIAA Traditional Annuity and the CREF Bond Market Account.

### B.   Defendants

25.     Washington University is a private, not-for-profit, nonsectarian institution of higher learning with its principal place of business in St. Louis, Missouri. The University is governed by a Board of Trustees.

26.     Washington University is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i), and, upon information and belief, it has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income. The University has acknowledged that it is the Plan Administrator in the Savings Plan's Summary Plan Description.

27.     The Washington University in St. Louis Board of Trustees is the governing body of Washington University. Washington University acts through the Board of Trustees and its executive leaders and administrators. According to Washington University's website, the Board of Trustees currently consists of 58 trustees.

28.     Defendants are fiduciaries to the Plan because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A)(i) and (iii). Furthermore, the Plan designates Washington University as the "named fiduciary" under 29 U.S.C. § 1102(a)(2) with responsibility for the control or management of Plan assets.

## V.     FACTS APPLICABLE TO ALL COUNTS

### A.     Overview of the Plan investments.

29.     Defendants exercised and continue to exercise discretionary authority over the investment options that are included in the Plan. The Plan's investments are designated by Defendants as available investment alternatives offered under the Plan.

30.     The Plan offers about 35 investments choices managed by TIAA-CREF, including variable annuities, registered investment companies and a pooled separate account.

31.     From year to year in the Class Period, the Savings Plan has also offered in excess of 80 investment options managed by Vanguard, which are all mutual funds.

32.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

33.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, for participants who invest in the TIAA Traditional Annuity through a Group Retirement Annuity contract, like the one held in the Plan, lump-sum withdrawals are available from the Traditional Annuity only within 120 days after termination of employment and are subject to a 2.5% surrender charge. All other withdrawals and transfers from the account must be paid in ten annual installments.  Rather than being available to participants if they wish to liquidate their funds earlier, a participant's investment in the TIAA Traditional Annuity can be withdrawn only over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to

withdraw their investment without a substantial penalty can only do so over ten years.

34.     The Plan's CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

35.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges.  For the R1 share class, which was the only share class available prior to 2015, those expenses consisted of the following:

        a. "administrative expense" charge (39.5 bps);[1]

        b. "distribution expense" charge (16.5 bps);

        c. "mortality and expense risk" charge (0.5 bps); and

        d. "investment management expense" charge (ranging from 4 to 15 bps).

36.     The TIAA Real Estate Account is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

        a. "administrative expense" charge (26.5 bps);

---

[1] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

- 11 -

b. "distribution expense" charge (12.5 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee "(17 bps); and

e. "investment management expense" charge (32 bps).

As of May 1, 2017, distribution fees were reduced to 10.5 basis points, but the fee for the liquidity guarantee was increased to 20 basis points. The current expenses for the Real Estate Account are 85 bps.

37.     The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

**B.      Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

38.     Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to jumbo defined contribution plans, like the Plan. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

39.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans solicit competitive bids for the plan's recordkeeping and administrative services at regular intervals of approximately five years.

40.     The cost of recordkeeping and administrative services depends on the number of participants.  The cost does not depend on the asset balance of the plan or the amount of savings

held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

41.     Mega or jumbo defined contribution plans, like the Plan, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in these plans increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

42.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, that is, recordkeeping expense calculated as a percentage of total plan assets, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to include the investment company's high-priced

funds included as plan investment options.

43.     Accordingly, a flat price based on the number of participants in a plan ensures that the amount of compensation is tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.* an increase in assets in the plan. Vanguard has recognized this principle in a company white paper called *Shining a Light on ERISA Budget Accounts*:

> In the past, defined contribution (DC) plan sponsors and service providers typically treated revenue generated from the plan's assets as the primary method of payment for recordkeeping service fees. This recordkeeping revenue has grown over the years due to regular employer and employee contributions and market appreciation of plan assets.

> Plan sponsors and recordkeepers have worked together to ensure that the revenue-sharing amount received by the recordkeeper doesn't exceed the amount specified for the price of administrative services. This can be accomplished through a variety of arrangements, such as *adopting lower-priced share classes* (with a corresponding reduction in credits or revenue sharing for recordkeeping) or *transitioning from asset-based fees to flat, per-participant fees*. (Emphasis added).

44.     TIAA and Vanguard were compensated for recordkeeping services as part of the indirect compensation structure based on asset management fees. Because revenue sharing payments are asset-based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate.

45.     Under DOL regulations that became effective January 1, 2009, certain employers with 403(b) plans became compelled to exercise greater control over their 403(b) plans than in the past. The regulations were expressly intended to make 403(b) plans more like 401(k) plans.

46.     Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan.

47.     Once the final regulations were published, many 403(b) plan fiduciaries

recognized that fulfilling their fiduciary obligations required them to engage in a comprehensive review of plan fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for the benefit of participants.

48.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages all plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

49.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, 403(b) Plan Sponsor Research (2013).[2]

50.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

**1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.

**2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[3]

---

[2] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf (last visited Aug. 17, 2017).
[3] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

51.     The benefits of using a single recordkeeper are clear:

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[4]

52.     In a study titled "How 403(b) Plan Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", Aon Hewitt similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

Aon Hewitt, *How 403(b) Plan are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).

53.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[5]

---

[4] *Id.*

[5] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

54.     Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[6] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[7]  Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[8]

55.     Despite the long-recognized benefits of a single recordkeeper for a defined

---

[6] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.[7] Available at

[7] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[8] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

contribution plan, during most of the Class Period Defendants continued to contract with *two* recordkeepers (TIAA-CREF and Vanguard) for years. The inefficient and costly structure maintained by Defendants caused Plan participants to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There was no loyal or prudent reason for Defendants' failure to engage in a process to reduce duplicative services and fees.

56.     The Savings Plan offered an unnecessary and highly confusing array of investment choices, with in excess of 35 investment options (annuity and mutual fund products) offered by TIAA-CREF and in excess of 80 mutual funds offered by Vanguard.

57.     Both of the Plan's recordkeepers received compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plan and its investments for providing these duplicative services.

58.     Upon information and belief and according to industry experts and the prospectus for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments prior to 2015 were:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 56 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15 bps |

59.     Vanguard was compensated for recordkeeping services based on internal revenue sharing it received from their mutual funds sold to the Plan.

60.     In addition, the Plan's recordkeepers received additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue,

distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

61.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level, and the recordkeeping market, benchmarking data indicates that a reasonable recordkeeping fee for the Plan would have been a fixed amount between $500,000 and $850,000 (approximately $35 per participant with an account balance).

62.     An examination of the prospectuses for the TIAA investment options and the Plan' financial data makes clear that the Plan paid at least hundreds of dollars per participant per year from 2011 to 2015 for recordkeeping—much higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

63.     Based on calculations derived from examination of the Plan's Forms 5500, TIAA received indirect compensation for recordkeeping and administrative services of $8.4 million from only the CREF variable annuities, the TIAA CREF Real Estate Account, and the TIAA Traditional Annuity, without regard to any other indirect compensation received from, for example, plan loans and revenue sharing from the TIAA mutual funds.  None of this indirect compensation was reported on any of the Savings Plan's Annual Returns filed with the DOL Employee Benefit Security Administration ("EBSA") on Form 5500, in violation of the explicit obligation to do so under federal law.

64.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The EBSA has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at

401(k) Plan Fees, at 1–2 (Aug. 2013).[9]

65.     Defendants also failed to control recordkeeping costs as Plan assets grew. From December 31, 2009 to December 31, 2015, the Plan's assets increased by nearly 60% from approximately $2.4 billion to approximately $3.8 billion. Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other loyally and prudently administered plans do, but failed to do so.

66.     Defendants failed prudently to monitor and control the compensation paid by the Plan for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers. Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings in the last six years alone.

67.     Annual Returns on Form 5500 provide substantial evidence of that failure. Forms 5500 are essentially the Plan's annual tax returns. DOL rules expressly require that plan service providers report all direct and indirect compensation received for the year in connection with those services. None of the Forms 5500 filed since 2009 disclose any amount of indirect compensation being received by TIAA. In fact, the first time the Plan's Forms 5500 indicated that TIAA even acknowledged receiving any direct or indirect compensation for recordkeeping

---

[9] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

services was for the 2011 Plan Year.  Whether these egregious reporting errors were caused by TIAA's reporting deficiencies or by Washington University's misrepresentation of TIAA's accurate reporting, the implication is the same—Washington University failed in its obligations to the Plan and its participants.

### C.   Defendants failed in their disclosure obligations, or alternatively allowed TIAA to pad its bill for Vanguard funds, or both.

68.     Further evidence of the carelessness on the part of Defendants in the exercise of their fiduciary obligations is provided by the participant fee disclosure required by 29 CFR 2550.404(a)(5) to be delivered annually to each participant,—a disclosure provided by TIAA. Among other information, the disclosure must provide an historical record of the investment return for the fund as well as the "expense ratio," which is the aggregate expense investors pay for investing in a fund and stated in "basis points" as a percentage of the amount invested.

69.     As previously alleged, participants can choose to invest in the TIAA investment options (annuities or mutual funds) or in a variety of mutual funds offered by Vanguard.  The participant fee disclosure includes investment return and expense information for the Vanguard funds as well as the TIAA funds. The reporting for the Vanguard funds, however, does not appear to be accurate. The following table provides a significant sample of the available Vanguard funds with their corresponding expense ratios as reported in the respective fund's prospectus and as reported by TIAA in a recent participant fee disclosure, and it highlights differences in the reporting of anywhere between one to four basis points:

| Washington University Retirement Savings Plan— Vanguard Fund Reported Expense Ratios | | | |
|---|---|---|---|
| **Fund** | **Expense from Prospectus (bps)** | **Expense Reported by TIAA (bps)** | **Differential (bps)** |

| Emerging Markets Stock Index Fund | 32 | 33 | 1 |
|---|---|---|---|
| Explorer Fund | 46 | 49 | 3 |
| Growth Index Fund | 22 | 23 | 1 |
| Health Care Fund | 36 | 34 | -2 |
| International Explorer | 41 | 42 | 1 |
| International Growth Fund | 46 | 47 | 1 |
| Mid-Cap Index Fund | 20 | 23 | 3 |
| Mid-Cap Growth Index | 20 | 23 | 3 |
| Mid-Cap Value Index | 20 | 23 | 3 |
| Morgan Growth Fund | 38 | 40 | 2 |
| PRIMECAP | 32 | 34 | 2 |
| Selected Value Fund | 35 | 39 | 4 |
| Small-Cap Index Fund | 20 | 23 | 3 |
| Intermediate Term Bond Index | 16 | 20 | 4 |
| Long-Term Bond Index | 16 | 20 | 4 |
| Short-Term Bond Index | 16 | 20 | 4 |
| Total Bond Market Index Fund | 16 | 20 | 4 |
| Total International | 18 | 19 | 1 |

| Stock Index Fund | | | |
|---|---|---|---|
| U.S. Growth Fund | 46 | 47 | 1 |
| Wellesley Income Fund | 22 | 23 | 1 |
| Windsor II Fund | 33 | 34 | 1 |

70.     On the assumption that the Vanguard prospectuses accurately reported fees charged to the respective Vanguard funds, this rather extensive reporting error demonstrates the cavalier attitude with which Defendants approached their fiduciary duties to give participants accurate information about Plan investments and costs. It should have been uncovered, disclosed to Plan participants, and corrected.

71.     But even worse, if it turns out that the participant fee disclosure is correct, that means that TIAA was padding the bill and assessing fees in excess of the fees actually charged by Vanguard, to the detriment of Plan participants who chose the Vanguard funds over the TIAA funds.

**D.     Defendants breached their fiduciary duties by acquiescing in the recordkeepers' bundling of products, which benefited the recordkeepers to the detriment of Plan participants.**

72.     Many service providers market and offer "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment products as well as administrative and recordkeeping services. These plans are often marketed as "free" plans, meaning there are supposedly no additional fees beyond the revenues the provider receives from having their proprietary products offered in the plan. In order to obtain the "free" pricing, the fiduciary must agree to put the provider's preferred investment lineup in the plan—a group of handpicked, typically proprietary funds guaranteeing that the provider would receive its desired

fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan is established would require the provider's approval or result in the plan being assessed additional direct fees.  In addition, the mandatory inclusion of proprietary products saddles a plan with multiple underperforming products that could have been substituted, by a faithful fiduciary, with a more focused menu of reasonably priced options.

73.     Thus, under these closed arrangements, funds are included in some defined contribution plans not based on an independent analysis of their merits or what is in the best interests of participants, but instead because of the benefits they provide to the plan's service providers.

74.     As identified by Peter Mooney, CEO of The Ancora Group's subsidiary Source Companies LLC, in an interview with Smart Business:

> When you use a bundled product, that plan is not owned by you, the employer. Instead, it is owned by the investment company, which negotiates each of the components and their fees, and then sells them bundled together.
>
> As a result, you are tied to whatever the investment company has negotiated. If you are not happy with some component of the plan, you must sell all the assets, move the entire plan to another investment company and then repurchase the assets. That also requires terminating the relationship with your third-party administrator and setting up a relationship with a new one.

75.     Furthermore, as noted by Carole Luckenbach, CEBS, in *Incorporating Best Practices Into Your 403(b) Plan*, 403(b) plans entailing bundled services and products charge fees as a percentage of assets and generally "do not provide fee and revenue transparency."

76.     Unlike the bundling model, in an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products and the plan fiduciary is free to reject the recordkeeper's conflicted proprietary fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can

include these more prudent funds in the plan's investment lineup.

77.     Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price.

78.     As further identified by Luckenbach:

> In contrast to a bundled plan, an *open investment architecture plan* allows the plan sponsor to hire a best-in-class recordkeeper/administrator that is independent from the menu of investment products (no requirement to offer proprietary investment products such as annuities or mutual funds). The goal of this approach is to provide participants access to the lowest cost investment options in a transparent environment. As a result, the investment lineup can be determined without restriction and offer the most competitive investment products that are better suited for participants.
>
> ***
>
> A better model for 403(b) plans would include an open architecture with a quality recordkeeper and best-in-class investment options. Fees for the recordkeeping/administration could be paid by an annual per-participant fee (versus the asset-based fee model). The recordkeeping/administrative fees would be charged equitably to all participants with fees tied to administrative services. The plan sponsor can solicit bids for recordkeeping/administrative services based on the strength of the vendor's capabilities and engage in a separate process to determine prudent investment options. The investment options can be selected by an independent investment advisor.

79.     Prudent fiduciaries of large defined contribution plans like the Plan have largely rejected bundling and embraced open architecture platforms due to the higher level transparency of this model.

80.     Unfortunately, as a result of Defendants' fiduciary breaches, the Plan has failed to embrace the open architecture platform and instead engaged service providers offering services

and investment products on an inefficient, overpriced, and imprudent bundled basis.

81.     TIAA provides and provided its 403(b) plan services exclusively on a bundled basis. TIAA clarifies this in its own literature:

> TIAA-CREF is a "bundled" service provider, meaning that many of the services needed to support retirement plans, such as investment management, recordkeeping, administration and participant communications, are provided through a single service provider, namely TIAA-CREF.

82.     If a plan wishes to offer the TIAA Traditional Annuity, TIAA requires that the CREF Stock Account, Money Market Account, and  many other proprietary products also be included in the plan, and requires the plan to use TIAA as recordkeeper for its proprietary products.

83.     There is no shortage of high-quality, low-cost alternatives to TIAA's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost.

84.     In addition, for over 30 years, Vanguard and TIAA together have provided the investment menu and administrative services in the Plan in exchange for indirect compensation. Thus, the Plan maintained two recordkeepers compensated based on the revenue sharing in the proprietary investments of TIAA and Vanguard and many overlapping and duplicative investment options.

85.     Defendants abdicated their ongoing duty to evaluate each of the proprietary TIAA

- 26 -

and Vanguard investment options offered within the Plan and to engage in a cost-benefit analysis to determine whether the TIAA services and the proprietary investment products required by TIAA to be in the Plan were prudent.

86.     The lack of any material changes in the package over many years evidences a lack of independent due deliberation by the Plan fiduciaries. This abdication resulted in the determination of the package by conflicted service providers.

87.     The Plan used TIAA and Vanguard as a duo of service providers to administer the Plan for many years, including during the Class Period, until June 2016.  TIAA has provided and continues to provide investment options and services on a bundled basis. The investment fees and administration fees paid to TIAA are based as a percentage of on assets under management. TIAA's bundling requirements mandate the inclusion of TIAA proprietary investment products and TIAA recordkeeping.

88.     Vanguard is a mutual fund company that exclusively offers its proprietary products on an asset-based fee basis.

89.     Since at least 2009, and during the Class Period, the Plan's package of services and investment options has included the bundled TIAA propriety products and services and the Vanguard propriety products and services.

90.     Since at least 2009, and during the Class Period, Defendants provided between 100 and 120 different mutual funds or insurance company annuity products from TIAA and Vanguard, many of which entailed higher-cost share classes of mutual funds despite the Plan's tremendous size and bargaining power to demand low-cost investments.

91.     This Plan investment menu consisted (and continues to consist) exclusively of proprietary Vanguard and TIAA products.  Further, TIAA products are required to be offered in

the Plan and cannot be removed without penalty to the Plan and its participants.

**E. Defendants breached their duty by failing to insist on institutional as opposed to more costly retail share classes**

92.     During the Class Period, the Plan's Vanguard fund offerings have largely included retail "investor" share classes and only some cheaper share classes of mutual funds. The retail share classes of mutual funds are designed for small individual investors, not large defined contribution retirement plans like the Plans, and are identical in every respect to institutional share class funds, except for much higher fees.

93.     As shown by the sampling of those funds in the table below, for years during the Class Period, Defendants could have designated the institutional share class or other cheaper alternatives (*e.g.*, Admiral shares or the cheapest Institutional Plus shares) for many of the designated Vanguard investment options at substantially lower cost to Plan participants. Such institutional class shares and other cheaper share classes (*e.g.* Admiral, I-Plus) are available to large investors like the Plan. However, the Plan failed to do so.

94.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. For example, Vanguard discloses in the prospectuses for the Vanguard Target Retirement Funds that

> Certain Vanguard clients may meet the minimum investment amount by aggregating separate accounts within the same Fund or across the lineup of Vanguard Institutional Target Retirement Funds and/or Vanguard Target Retirement Funds.

95.     Thus, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plan's size, the investment provider can make available lower-cost share classes even with respect to particular funds for which the plan does not reach the

minimum investment threshold.

96.     There was no rational basis for migrating TIAA mutual funds over to institutional shares (which the Plan did in 2011) but not doing the same for the Vanguard investment options, or for including cheaper share classes for only a few of the Vanguard investment choices at various points during the Class Period while maintaining more expensive share classes for the large majority of Vanguard funds. If a selection of higher-cost share classes was intended to offset the cost of recordkeeping, it was an exceedingly poor decision, considering the amounts being collected by TIAA for recordkeeping services.

97.     Despite the availability of far lower-cost options, for years Defendants selected investment options (namely Vanguard mutual funds) with far higher costs. The following table lists examples from during the Class Period of the Plan's designation of investor as opposed to lower-cost institutional classes as investment options with respect to Vanguard mutual funds at various points during the Class period:

| EXPENSE RATIO COMPARISON: Vanguard Investor Shares vs. Institutional Shares | | | |
|---|---|---|---|
| **INVESTOR SHARES OFFERED BY THE PLANS** | **EXPENSE RATIO** | **INSTITUTIONAL SHARES, FOR THE SAME FUNDS, NOT OFFERED BY THE PLANS** | **EXPENSE RATIO** |
| **Bond Funds** | | | |
| Inflation-Protected Securities Inv. (VIPSX) | 0.20% | Inflation-Protected Securities Institutional Shares (VIPIX) | 0.07% |
| Total Bond Market Index Investor shares (VBMFX) | 0.15% | Total Bond Market Index Admiral Shares (VBTLX) | 0.05% |
| Short-Term Federal Fund-Inv (VSGBX) | 0.16% | Short-Term Federal Fund – Admiral  (VSGDX) | 0.06% |
| Long-Term Investment-Grade-Inv (VFICX) | 0.20% | Long-Term Investment-Grade-Adm (VFIDX) | 0.10% |
| Short-Term Treasury Fund - | 0.20% | Short-Term Treasury Fund - | 0.10% |

| Inv (VFISX) | | Adm (VFIUX) | |
|---|---|---|---|
| **Balanced Funds** | | | |
| Vanguard Life Strategy Investor (VTWNX) | 0.14% | Vanguard Life Strategy Investor (VITWX) | 0.10% |
| Vanguard Wellesley Income Fund (VWINX) | 0.22% | Vanguard Wellesley Income Fund (VWIAX) | 0.15% |
| Vanguard Balanced Index Fund Investor Shares (VBINX) | 0.22% | Balanced Index Fund Institutional Shares (VBAIX) | 0.07% |
| **Stock Funds** | | | |
| Vanguard Dividend Growth Investor (VDIGX) | 0.30% | Vanguard Dividend Growth Institutional  (VIGIX) | 0.05% |
| Vanguard FTSE Social Index Fund Investor Shares (VFTSX) | 0.22% | FTSE Social Index Fund Institutional Shares (VFTNX) | 0.12% |
| Vanguard Small-Cap Growth Index Fund Investor Shares (VISGX) | 0.20% | Small-Cap Growth Index Fund Institutional Shares (VSGIX) | 0.07% |
| Vanguard 500 Index Fund (VFINX) | 0.14% | Vanguard 500 Index Fund Institutional Shares (VFIAX) | 0.04% |
| **International** | | | |
| **Vanguard International Growth – Inv** (VWIGX) | 0.46% | Vanguard International Growth -Inst (VWILX) | 0.33% |
| **Vanguard European Stock Index-Inv (VEURX)** | 0.26% | Vanguard European Stock Index-Inst (VESIX) | 0.08% |

98.     As of April 2017, Defendants continue to imprudently offer a handful of more expensive share classes of Vanguard funds. According to the Plan's TIAA website, the Plan continues to offer 6 Vanguard mutual funds in investor or Admiral shares whereas cheaper options are available, as seen below:

| **Plan Fund** | **Expense** | **Cheaper Alternative** | **Expense** |
|---|---|---|---|
| Vanguard FTSE Social Index Fund (Inv) (VFTSX) | 22 bps | Vanguard FTSE Social Index Fund (Inst) (VFTNX) | 12 bps |
| Vanguard Developed Markets Index Fund (Adm) (VTMGX) | 7 bps | Vanguard Developed Markets Index Fund (Inst; Inst Plus) (VTMNX; VDIPX) | 6 bps; 5 bps |
| Vanguard European Stock | 10 bps | Vanguard European Stock Index | 8 bps; 7 bps |

| Index Fund (Adm) (VEUSX) | | Fund (Inst; Inst Plus) (VESIX; VEUPX) | |
|---|---|---|---|
| Vanguard FTSE All World ex US Index Fund (Adm) (VFWAX) | 11 bps | Vanguard FTSE All World ex US Index Fund (Inst; Inst Plus) (VFWSX; VFWPX) | 10 bps; 7 bps |
| Vanguard Large Cap Index Fund (Adm) (VLCAX) | 6 bps | Vanguard Large Cap Index Fund (Inst) | 5 bps |
| Vanguard Pacific Stock Index Fund (Adm) (VPADX) | 10 bps | Vanguard Pacific Stock Index Fund (Inst) (VPKIX) | 8 bps |

### F.    Defendants imprudently retained and continue to retain an unnavigable number of investment options in the Plan

99.    As of the most recent Form 5500 filed with the DOL on July 29, 2016 for the Plan year ended December 31, 2015, Defendants included 119 investment options in the Plan. The Plan's $3.77 billion in net assets were invested in these investment options. Among the available investments, 36 were TIAA options, holding $2.74 billion in Plan assets, and 83 were Vanguard options, holding $1.03 billion. The 119 options included mostly retail class Vanguard mutual funds, some (*i.e.,* a few) intermediary share class mutual funds, insurance separate accounts, variable annuity options, and fixed annuity options.

100.    Likewise, and based upon the Plan's Forms 5500:

- in Plan year 2014, there were 119 investment options in the Plan holding the Plan's approximately $3.73 billion in assets, of which options 36 were TIAA products and 83 were Vanguard mutual funds;

- in Plan year 2013, there were 120 investment options in the Plan holding the Plan's approximately $3.51 billion in assets, of which options 36 were TIAA products and 84 were Vanguard mutual funds;

- in Plan year 2012, there were 120 investment options in the Plan holding the Plan's approximately $3.02 billion in assets, of which options 36 were TIAA products and 84 were Vanguard mutual funds;

- in Plan year 2011, there were 121 investment options in the Plan holding the Plan's approximately $2.73 billion in assets, of which options 36 were TIAA products and 85 were Vanguard mutual funds;

- in Plan year 2010, there were 119 investment options in the Plan holding the Plan's approximately $2.7 billion in assets, of which options 35 were TIAA products and 84 were Vanguard mutual funds; and

- in Plan year 2009, there were 117 investment options in the Plan holding the Plan's approximately $2.43 billion in assets, of which options 35 were TIAA products and 82 were Vanguard mutual funds.

101.    No prudent fiduciary would offer this many investment options in overlapping asset classes and investment objectives within a retirement plan. The thousands of pages of prospectuses accompanying such a volume of investment options is unmanageable by participants, let alone the Plan's fiduciaries, and does not permit participants to make informed decisions about their retirement investments.

102.    The Plan continues to offer an unmanageable number of investment options. As of present, and per the Plan's TIAA-hosted website, the Plan offers or holds assets in 121 investment options—80 Vanguard mutual funds and 41 TIAA annuity and mutual fund products.

**G. Defendants continue to allow the Plan to be saddled with an imprudent bundling structure**

103.    The Plan continues to offer bundled and proprietary investments of the recordkeeper, TIAA, and Vanguard, including numerous investments in overlapping or duplicative investment styles and asset classes, and on a bundled services/products arrangement, all resulting in excessive and unnecessary fees to the Plan, and to the great financial detriment of Plan participants. In doing so, the Plan has chosen and continues to retain imprudent TIAA investment options instead of consolidating many of the investment options available in the Plan, purely because the Plan must offer these TIAA products.

104.    For illustration purposes, in the large cap blend investment style for the Plan, Defendants included twelve actively managed or passively managed investment options for a combined asset amount of approximately $928.5 million as of December 31, 2015. Those

investments are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Investment | 2015 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| CREF Equity Index | $57,883,749 | 36.5 bps | 2 bps | 1725% |
| CREF Stock | $632,643,451 | 38 bps | 2 bps | 1800% |
| TIAA-CREF Large-Cap Growth Index (Inst) | $11,765,275 | 6 bps | 2 bps | 200% |
| TIAA-CREF Large-Cap Value (Inst) | $31,726,023 | 42 bps | 2 bps | 2000% |
| TIAA-CREF Large-Cap Value Index (Inst) | $28,679,518 | 6 bps | 2 bps | 200% |
| TIAA-CREF S&P 500 Index (Inst) | $19,380,666 | 6 bps | 2 bps | 200% |
| Vanguard 500 Index Fund (Adm) (VFIAX) | $74,376,077 | 5 bps | 2 bps | 150% |
| Vanguard Dividend Appreciation Index Fund (Inv) (VDAIX) | $1,102,344 | 20 bps | 2 bps | 900% |
| Vanguard Growth & Income Fund (Inv) (VQNPX) | $12,489,539 | 34 bps | 2 bps | 1600% |
| Vanguard Large-Cap Index Fund (Inv) (VLACX) | $2,465,665 | 20 bps | 2 bps | 900% |
| Vanguard PRIMECAP Core Fund (Inv) (VPCCX) | $4,143,756 | 47 bps | 2 bps | 2250% |
| Vanguard Total Stock Market Index Fund (Adm) (VTSAX) | $51,801,752 | 5 bps | 2 bps | 150% |
| **TOTAL ASSETS** | **$928,457,815** | | | |

105.    With over $690 million held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were 18 and 19 times more expensive than the lower-cost Vanguard option (VIIIX) with an expense ratio of 2 bps.

106.    Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options

been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), Plan participants would have avoided losing millions in excess fees during the Class Period.

107.    Consolidation of the large cap blend options into one or two less expensive index funds was not possible because TIAA required that these funds be included in the Plan in conjunction with its provision of services.

108.    There is no prudent reason for the Plan to have locked participants into TIAA's imprudent "bundling" arrangement and to fail to streamline the Plan investment menu, as fiduciaries of many other similar retirement plans have done.

### H. Defendants imprudently retained historically underperforming Plan investments.

109.    Given Defendants' failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plan.

#### 1.    CREF Stock Account

110.    Investments in the CREF Stock Account as of December 31, 2015 represented roughly 16.8 percent of the Plan's assets, and the CREF Stock Account has been included as an investment option in the Plan from at least 2009 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large-cap blend Morningstar category. This option has for years underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that have been available to the Plan, some of which were included as Plan investment options.

111.    As described above, TIAA-CREF imposes restrictive provisions on the specific

annuities that must be provided in the Plan. Under these terms, TIAA-CREF requires that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional Annuity and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. Prior to the creation of three separate share classes for the CREF Stock Account (and many of TIAA's variable annuity products) in mid-2015, the CREF Stock Account paid 56 bps for revenue sharing as administrative expense and "distribution fees" that exceeded other TIAA-CREF investments by over 50% (15 bps).

112.    Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option for the particular investment style and asset class.

113.    Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendants provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large-cap domestic equity market is the most efficient market, and active managers do not outperform passive managers net of fees in this investment style.

114.     Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large-cap index after fees. That is what, in fact, occurred.

115.     Rather than performing poorly in a single year or two, the CREF Stock Account has persistently experienced poor performance for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. As the performance chart shows, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



116.    The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

117.    Apart from underperforming passively managed index funds, the CREF Stock Account fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the

Vanguard Capital Opp. (Adm) (VHCAX), all of which are and have been included in the Plan as investment options.



118.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[10]

---

[10] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP





(Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.



119.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (40 bps), the Vanguard PRIMECAP (Adm) (35 bps), and the Vanguard Capital Opp. (Adm) (40 bps).

120.    Reflecting the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plans. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[11] This recommendation was due to numerous factors, including the

---

[11]Available       at       http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

121.    TIAA's own literature regarding the CREF Stock Account  makes clear that this account has historically underperformed the CREF Composite Benchmark, the Russell 3000 Index, and the Morningstar Large Blend Average:

| Performance | | | | | | |
|---|---|---|---|---|---|---|
| | **Total Return** | | **Average Annual Total Return[3]** | | | |
| | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years |
| CREF Stock Account | 2.08% | 9.17% | 9.17% | 4.83% | 11.55% | 5.03% |
| CREF Composite Benchmark | 2.49% | 10.25% | 10.25% | 5.44% | 11.86% | 5.25% |
| Russell 3000 Index | 4.21% | 12.74% | 12.74% | 8.43% | 14.67% | 7.07% |
| Morningstar Large Blend Average | 3.86% | 10.37% | 10.37% | 6.80% | 13.18% | 6.07% |

122.    ERISA fiduciaries have a continuing duty to monitor investments and remove imprudent ones. In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plan and the opinion of one of the foremost authorities in the retirement investment industry that ***no*** retirement plan should own this fund.

123.    Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries must and do replace those imprudent investments with better performing and reasonably priced options. While the Stock Account should have never been included in the Plan through TIAA's bundling

arrangement in the first place, under the standards used by prudent independent fiduciaries, , the CREF Stock Account would have been removed from the Plan, but it was not.

124.     Had Defendants removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, Plan participants would not have lost millions of dollars of retirement savings.

### 2.     TIAA Real Estate Account

125.     The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from EBSA just to be able to offer the fund as an investment choice to ERISA plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

126.     Defendants selected and continue to offer the TIAA Real Estate Account as a real estate investment option in the Plan, despite the facts that this investment has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX),—an investment option that is also available in the Plan.

127.     With an expense ratio of 88.5 bps as of December 31, 2014, and a current expense ratio of 85 bps, the TIAA Real Estate Account has been, at times, more than eight times more expensive than the Vanguard REIT Index (Inst), which has an expense ratio of 10 bps.

128.     Simply stating the expense ratio does not tell the whole story of fund expenses.

TIAA disclosures indicate that included in the TIAA Real Estate Account's investment management fees is the expense of an independent fiduciary, which is retained to approve appraisers of the Account's assets, ensure that acquisitions meet the Account's investment guidelines, and address various other aspects of the operation of the Account that are and should be the obligations of TIAA as the fund manager.  In fact, TIAA selects the appraisers and the fund's investments, and determines all other matters relating to the management of the fund that are then subject to the approval of the independent fiduciary.  The reason that the Account needs the services of an independent fiduciary is to ensure that TIAA, as the manager of the fund, does not engage in a variety of prohibited transactions, including self-dealing transactions. By obtaining the approval of the independent fiduciary, TIAA is able to engage in transactions with parties-in-interest, including with related parties, that it otherwise could not engage in. In other words, the independent fiduciary is required in order to allow TIAA to manage the Real Estate Account and offer it as an investment choice to retirement plans. It is an expense that should be borne entirely by TIAA as a cost of engaging in the business—not a legitimate expense of the operation of the fund.

129.    The TIAA Real Estate Account had a history of substantial under-performance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009. Despite this, Defendants selected and continues to retain it in the Plan.



130.   This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.



131.    The  very  design  of  the  TIAA  Real  Estate  Account  creates  such  operational difficulties,  and  burdens  investors  in  the  fund  with  such  significant  additional  expense,  that  a reasonable  plan  fiduciary  should  have  questioned  whether  the  fund  was  an  appropriate investment at all for participant-directed individual account plans like the Plan.

132.    Additionally,  the  fund  invests  directly  in  real  property  assets  that  are  highly illiquid. In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but, as of May 1, 2017, charges participants an additional 20 basis points for that liquidity guarantee.

133.    The 20 bps "liquidity guarantee" expense of the Real Estate Account is explained

by TIAA as simply "enabling the Account to have funds available to meet participant redemption, transfer of or cash withdrawal request." TIAA acknowledges this is a no-value-added "service" because "[t]his guarantee is required by the [New York Department of Financial Services]." This fee is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index Institutional (VGSNX), which has a total expense ratio of 10 bps as of February 8, 2017, compared to the TIAA Real Estate Account's total current expense ratio of 85 bps.

134.    The Real Estate Account charges participants 26.5 basis points for administration expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points.  A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

135.    Finally, the Real Estate Account has during the Class Period charged 12.5 basis points for "distribution fees," and continues to charge 10.5 basis points for distribution. Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA.  The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

136.    The Real Estate Account's poor performance coupled with (its current) 85 basis points in unreasonable and excessive fees, makes the TIAA Real Estate Account an exceedingly poor choice by any measure. Defendants' selection of the Real Estate Account as a Plan

investment option speaks for itself in evaluating the performance of Defendants' fiduciary obligation to act solely in the best interest of participants for the exclusive purpose of providing them benefits under the Plan.

137.    Prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. In contrast, Defendants failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

138.    Had Defendants removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index—which is already available in the Plan, meaning that such participant invested dollars and contributions could have easily been migrated or re-allocated to this option—or some other reasonable alternative, Plan participants would not have lost millions of dollars of their retirement savings.

### 3.    TIAA Non-Benefit Responsive Traditional Annuity

139.    The Traditional Annuity prohibits participants from re-directing their investment in that Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives change. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they pay a 2.5% surrender charge that bears no relationship to any reasonable risk or expense to which the fund is subject.

140.    The TIAA Traditional Annuity is an insurance company general account product, meaning that all of the assets supporting the annuity contract are held in TIAA's general account,

and invested along with all the other assets in TIAA's general account.  All of the assets of the TIAA general account are available to support the obligations of the Traditional Annuity.

141.    One of the fundamental requirements of ERISA is that every contract or agreement between a plan and an investment manager like TIAA must be reasonable, and that no contract or agreement is reasonable within the meaning of section 408(b)(2) of ERISA if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances, in order to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

142.    As expressly noted in 29 CFR 2550.408b-2(c)(3), a provision in a contract or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination of the contract, arrangement, or lease is not a penalty. For example, a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty. Similarly, a provision in a lease for a termination fee that covers reasonably foreseeable expenses related to the vacancy and re-letting of the office space upon early termination of the lease is not a penalty. Such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation of damages.

143.    The 2.5% surrender charge imposed by the TIAA Traditional Annuity on lump sum withdrawals, which completely fails to take into account the financial conditions of the TIAA general account, is a clear and patent violation of the prohibition on a penalty for early withdrawal from the contract.  Suppose, for example, that in connection with the investment of participant accounts in the Traditional Annuity, TIAA acquired long-term bonds paying an interest rate of 4%, and that Plaintiff Latasha Davis has invested in the Traditional Annuity for

twenty years before her retirement.  If, at her retirement, those bonds have increased in value by 10% due to changes in prevailing interest rates, and Latasha requests a lump sum distribution, TIAA could easily sell those bonds at a profit and pay Latasha her lump sum distribution. Instead, getting a lump sum distribution will cost Latasha a 2.5% surrender charge, ostensibly to protect TIAA from a loss it would not incur.  A surrender charge that is always imposed for the life of a contract, regardless of the term of a participant's investment in the contract and regardless of the financial condition of TIAA's general account at the time of withdrawal, is *per se* unreasonable because it will invariably result in charges that are wholly unrelated to any actual loss.

144.    To have accepted these conditions for the investment of plan assets indicates that either (i) Defendants failed in their obligation to thoroughly understand the terms of the contract or (ii) failed to act in the best interest of Plan participants in accepting such unreasonable terms.

145.    Even if Defendants were blissfully and excusably unaware of the nature of the surrender change at the time of the initial investment in the contract, the DOL's release of its final regulation under ERISA § 408(b)(2), *Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure* (the "408b-2 Disclosure Rule"), on February 2, 2012, should have alerted them to the issue.

146.    Release of the 408b-2 Disclosure Rule was a big deal. No reasonable responsible plan fiduciary could have missed it, since it required affirmative compliance of virtually every plan service provider and fiduciary by July 2012.

147.    As noted above, the 408b-2 Disclosure Rule contains an express provision in 29 CFR 2550.408b-2(c)(3) addressing the requirement for contacts to be terminable on reasonably short notice without penalty. In fact, insurance companies discussed the issue of surrender

charges with the DOL prior to the issuance of the final rule.  As noted in the Preamble to the

Interim Final Rule:

> ***Other commenters raised questions as to whether certain fees and market value
> adjustments, generally associated with insurance or insurance-type services and
> investments, constitute "penalties" for purposes of this paragraph of the regulation***.
> The regulation provides specifically that "a minimal fee in a service contract which is
> charged to allow recoupment of reasonable start-up costs is not a penalty." ***The
> Department believes that questions as to whether, for any particular contract, the
> charges for contract termination are in fact "penalties," rather than a service
> provider's recoupment of reasonable start-up costs, are inherently factual questions;
> accordingly, the Department did not amend the rule in response to these comments***.
> After consideration of all of the comments on paragraph (c )(2) of the proposal, the
> Department has determined to adopt that paragraph, without change, in the interim final
> rule, except that this provision has been moved to a new paragraph (c )(3) of the interim
> final rule.

(Emphasis added.)

148.    Accordingly, the very existence of a 2.5% surrender charge that never varies

regardless of the financial consequence of the withdrawal is unreasonable, and the acceptance of

such terms, a breach of fiduciary duty.

## VI.    FAITHFUL FIDUCIARIES AT OTHER INSITUTIONS LONG AGO IMPLEMENTED REPORMS TO IMPROVE PLAN PERFORMANCE AND PARTICIPANT OPTIONS

149.    As the sponsors of other university retirement plans have demonstrated,

Washington University was fully capable of (but failed in) discharging its responsibilities in a

lawful manner for the benefit of Plan participants and beneficiaries. The fiduciaries of many

403(b) plans implemented dramatic overhauls to their plans years ago and acknowledged that

these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary

obligations under ERISA.

### A.    The Loyola Marymount Example

150.   In its 403(b) Retirement Plan Review Project Overview, the fiduciaries of the Loyola Marymount University ("LMU") 403(b) defined contribution plan recognized that, "Recordkeeping must be consolidated and/or managed by a single party," and that "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services."

151.   To assist LMU in assessing the plan's investment options and recordkeeping services, beginning in 2008, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TIAA.

152.   LMU consolidated from two recordkeepers to one effective on the date the final DOL regulation became effective, January 1, 2009. Moreover, LMU selected Diversified as the new recordkeeper because Diversified did not require bundling investment products and that certain investment options be offered by LMU. LMU was therefore able to offer "best in class" funds in each fund category.

153.   Notably, LMU cited a number of reasons for why it did not select TIAA (and instead selected Diversified) as the recordkeeper, including but not limited to because:

- The annuity products offered by TIAA have not performed as well as the mutual funds offered by other service providers;

- Over the long run, selection of TIAA would result in higher fees paid by faculty and staff;

- TIAA offered less reliable administrative services; and

- TIAA received an unfavorable audit review.

154.   LMU also recognized that while the TIAA traditional fixed annuity has a favorable historical return rate, "the higher returns associated with TIAA traditional fixed annuity come at the expense of a severe lock-up period during which an investor who wants to transfer assets out of the account is currently required to move assets out gradually over a period of 10 years."

### B.   The Pepperdine Example

155.   Pepperdine University followed suit in consolidating from four recordkeepers after determining that it must make certain changes to its retirement plan.

156.   Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper that does not offer proprietary investments, as the sole administrator and consolidated from four recordkeepers (Fidelity, TIAA, Vanguard and Prudential) to a single recordkeeper.

157.   Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. As identified by Paul Lasiter in his National Association of College and University Business Officers (NACUBO) publication entitled *Single Provider, Multiple Choices*, Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale."

158.    Pepperdine also recognized that the bundled model (discussed, *infra*.) demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's investment menu—whether or not those investments offered participants the best range of choice, value, and relative performance."

159.    Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'" After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants."

**C.    The Purdue Example**

160.    In the fall of 2008, Purdue University began a comprehensive review of its defined contribution retirement program. According to James S. Almond in *403(b) Plan Redesign–Making a Good Retirement Plan Better*, Purdue recognized that "[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans*, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector."

161.    Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to

recordkeepers. The benefits of Purdue's program enhancements included the transition from five providers (TIAA, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated \$3–4 million per year which is then compounded over time."

### D.   **The Caltech Example**

162.    Likewise, as reported in an Institutional Investor article called *Caltech Names TIAA-CREF Recordkeeper*, the California Institute of Technology TIAA-CREF DC Retirement Plan consolidated from two recordkeepers (TIAA and Fidelity) to a single recordkeeper (TIAA) effective January 1, 2010, with the assistance of an independent third-party consultant, Mercer Investment Consulting.

163.    In selecting a core set of investment options for the plan, Caltech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the DOL, between 2013 and 2015, Caltech negotiated over \$15 million in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

E.    **The Notre Dame Example**

164.    In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market."

165.    Hewitt noted several areas of plan improvements. First, recordkeeper consolidation provided "many benefits to participants," including cost savings, and Hewitt identified that "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants."

166.    Second, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." An unbundled arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup.

VII.   **ERISA'S FIDUCIARY STANDARDS**

167.    ERISA extends fiduciary status to named fiduciaries and functional fiduciaries. A person is a functional fiduciary to the extent that (1) he or she exercises control over the

management of the plan, or any authority or control over plan assets; (2) he or she exercises

discretionary authority or control over plan assets or (3) he or she renders investment advice for a

fee or other compensation.

168.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants

as Plan fiduciaries. Section 1104(a) provides:

> (a) Prudent Man Standard of Care
>
>> (1)  . . . a fiduciary shall discharge his duties with respect to a plan solely in
>> the interest of the participants and beneficiaries and –
>>
>>> (A) for the exclusive purpose of
>>>
>>>> (i) providing benefits to participants and their beneficiaries; and
>>>>
>>>> (ii) defraying reasonable expenses of administering the plan; [and]
>>>
>>> (B) with the care, skill, prudence, and diligence under the circumstances
>>> then prevailing that a prudent man acting in a like capacity and
>>> familiar with such matters would use in the conduct of an enterprise of
>>> like character and with like aims.

169.    29 U.S.C. § 1103(c)(1) provides that plan assets shall be held for the exclusive

purposes of providing benefits to participants in the plan and their beneficiaries and defraying

reasonable expenses of administering the plan.

170.    ERISA fiduciaries exercising authority or control over plan assets, including the

selection of plan investments and service providers, must act prudently and for the exclusive

benefit of participants in the plan, and not for the benefit of others.

171.    Fiduciaries must ensure that the amount of fees paid to service providers is

reasonable.

172.    ERISA's fiduciary duties are the highest known to the law and must be performed

with an eye exclusively on the interests of participants. Defendants' fiduciary duties apply

continuously in the administration of the Plan and do not abate upon the engagement of service providers or upon an initial selection or approval of Plan investments. The duty to conduct an independent investigation into the merits of a particular investment is a basic aspect of Defendants' fiduciary duties under ERISA. Fiduciaries must use appropriate methods to investigate the merits of plan investments. Fiduciaries must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants. Fiduciaries also have a continuing duty to monitor plan investments and remove imprudent ones. This duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments.

173.    Likewise, Defendants cannot abdicate their ongoing fiduciary duties to the Plan participants by including a very large number of investment alternatives in the Plan's investment options menu and then leave to the participants the responsibility for choosing among them.

174.    Furthermore, under ERISA selecting higher-cost investments that benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. Defendants cannot abdicate their ongoing fiduciary duties to conflicted decision-makers.

175.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106, and are considered *per se* violations because they entail a high potential for abuse. 29 U.S.C. § 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> * * *

- 57 -

(C)  furnishing of goods, services, or facilities between the plan and party in interest;

(D)  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

176.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

177.    Section 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VIII.   CLASS ACTION ALLEGATIONS

178.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or

beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

179.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Class"):

> All participants and beneficiaries of The Washington University Retirement Savings Plan from April 28, 2011, through the date of judgment, excluding the Defendants or any participant who is a fiduciary to the Plan.

180.    Excluded from the Class are Defendants and any Plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

181.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

182.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. On the basis of Form 5500 filed with the DOL for the Plan year ending December 31, 2015, the Class includes at least 24,000 individual current Plan participants.

183.   **Existence and Predominance of Common Questions of Fact and Law:**
Common questions of law and fact exist as to all members of the Class because Defendants owed
fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and
omissions alleged herein as to the Plan and not as to any individual participant. These questions
predominate over the questions affecting individual Class Members. These common legal and
factual questions include, but are not limited to:

    a.   who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b.   whether Defendants were  fiduciaries to the Plan under ERISA;

    c.   whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

    d.   whether the Plan and Plan participants are entitled to damages or monetary relief
       as a result of Defendants' breaches of fiduciary duties;

    e.   if so, the amount of damages or monetary relief that should be provided to the
       Plan and its participants;

    f.   what Plan-wide equitable and other relief the court should impose in light of
       Defendants' breaches; and

    g.   whether the Plan and its participants are entitled to any other relief as a result of
       Defendants' breaches and conduct alleged herein.

Given that Defendants have engaged in a common course of conduct as to Plaintiffs and
the Class, similar or identical injuries and violations are involved and common questions far
outweigh any potential individual questions.

184.   **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because
Plaintiffs were participants during the Class Period and all Plan participants were harmed by the
uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class Members, and the

Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

185.    183.    **Adequacy:** Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent; they were participants in the Plan during the Class Period; and they are committed to vigorously representing the Class. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation – including ERISA, securities, shareholder, and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

186.    **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable,   the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class Member has an interest in individually controlling the

prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

187.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees**

188.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

189.    The scope of the fiduciary duties and responsibilities of Defendants includes discharging its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA. Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investment options on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

190.    Defendants selected and retained as the Plan's investment options investment funds and insurance company annuities that caused the Plan to incur far higher administrative fees and expenses relative to the size and complexity of the Plan.

191.    For years Defendants failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plan to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being

provided.

192.    Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and its participants, and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

193.    Defendants' failure to properly evaluate the reasonableness of fees being charged to the Plan has caused Plaintiff and the Class millions of dollars in direct economic loss.  The Plan's total losses will be determined after complete discovery in this case and are continuing.

194.     Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable or remedial relief as appropriate.

**COUNT II**
**Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses**

195.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

196.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

197.    ERISA fiduciaries must fulfill a duty of prudence that involves a continuing duty to monitor investments and remove imprudent ones.

198.    Defendants selected and retained as Plan investment options investment funds and insurance company annuities with far higher expenses and poorer performance relative to other investment options that were readily available to the Plan at all relevant times.

199.    Rather than consolidating the Plan's many investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained duplicative investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower-cost share classes of certain investments and, in addition, confusing Plan participants by providing them a dizzying array of investment options.

200.    Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Rather, Defendants used more expensive funds with inferior historical performance than investments that were available to the Plan.

201.    CREF Stock Account: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

202.    TIAA Real Estate Account: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plan despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

203.    TIAA Traditional Annuity: Defendants failed to thoroughly evaluate the surrender charges imposed on Plan participants wishing to take a lump sum distribution or, worse, knowingly saddled participants with severe restrictions on their ability to withdraw from the

Traditional Annuity, even at retirement, without the imposition of a penalty.

204.    Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and their participants, and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

205.    Total Plan losses will be determined after complete discovery in this case and are continuing.

206.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

<u>COUNT III</u>
**Prohibited Transaction – Lending of Money or Other Extension of Credit Between a Plan and a Party in Interest**

207.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

208.    ERISA § 406(a)(1)(B), 29 U.S.C. §1106(a)(1)(B), provides that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he or she knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

209.    Defendants are fiduciaries responsible for arranging for and administering the participant loan program with respect to the Plan.

210.    Defendants are fiduciaries responsible for determining the interest rate for

participant loans, for transferring assets from the accounts of participants who take loans from their retirement accounts to the TIAA Traditional Annuity or to a Retirement Loan certificate, and for determining the interest rate participants will receive on their loan "collateral" invested in the Traditional Annuity or in Retirement Loan certificate.

211.    By accepting and approving the design and administration of a loan program in a manner intended to benefit TIAA, a party in interest to the Plan, at the expense of Plaintiffs and Class members, Defendants violated their duty of loyalty set forth in ERISA § 404(a).

212.    By accepting and approving the design and administration of a loan program that violated the conditions for the exemption available for plan loans set forth in 29 CFR 2550.408b-1, Defendants have caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a).

213.    Defendants are liable under 29 U.S.C. §1109(a) to make good to Plaintiffs and the Class losses resulting from the prohibited transactions alleged in this Count and are subject to other equitable or remedial relief as appropriate.

### COUNT IV
### Prohibited Transaction – Transfer of Plan Assets to or for
### the Use of a Party in Interest

214.    Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

215.    ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), prohibits a plan fiduciary from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

216.    ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), provides that a "party in interest"

includes "a person providing services to [a] plan."

217.    TIAA is a party in interest with respect to Plaintiffs, the Plan, and the Class, providing record keeping, custodial, and other investment and administrative services to the Plan.

218.    The requirement that participants in the Plan must transfer a portion of a their accounts to TIAA as security for repayment of a plan loan constitutes a prohibited transfer of plan assets to or for the use and benefit of TIAA, a party in interest, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

219.    By requiring that  Plaintiffs and Class members transfer a portion of a their retirement savings to TIAA as security for repayment of a participant loan, as a result of which TIAA will earn the spread between the interest charged to the participant for the loan and the interest paid by TIAA to the Plan participant through the Traditional Annuity or the Retirement Loan certificate, Defendants are causing the Plan to transfer Plan assets to or for the use and benefit of a party in interest in violation of ERISA § 406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D).

220.    Defendants are liable under 29 U.S.C. §1109(a) for all losses to Plaintiffs and Class members resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

• Find and declare that the Defendants have breached their fiduciary duties as described above;

• Find and adjudge that Defendants are personally liable to make good to the Plan all

losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

• Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

• Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plan to include only prudent investments;

• Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

• Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint the Edgar Law Firm, Schneider Wallace Cottrell Konecky Wotkyns LLP, Berger & Montague P.C., and Chimicles & Tikellis LLP as Class Counsel;

• Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.

Date: August 21, 2017                    By:      /s/ John F. Edgar
                                                  John F. Edgar        # 47128
                                                  Matthew T. Swift     # 63601
                                                  EDGAR LAW FIRM LLC
                                                  1032 Pennsylvania Avenue
                                                  Kansas City, MO 64105
                                                  Phone: 816-399-5158
                                                  Fax: 816-531-3322

                                                  Garrett W. Wotkyns*
                                                  John J. Nestico*
                                                  Michael McKay*
                                                  SCHNEIDER WALLACE COTTRELL
                                                  KONECKY WOTKYNS LLP
                                                  8501 N. Scottsdale Road, Suite 270
                                                  Scottsdale, Arizona  85253
                                                  Telephone: (480) 428-0145
                                                  Facsimile: (866) 505-8036
                                                  gwotkyns@schneiderwallace.com
                                                  mmckay@schneiderwallace.com
                                                  jnestico@schneiderwallace.com

                                                  Todd Schneider*
                                                  SCHNEIDER WALLACE COTTRELL
                                                  KONECKY WOTKYNS LLP
                                                  2000 Powell Street, Suite 1400
                                                  Emeryville, California  94608
                                                  Telephone: (415) 421-7100
                                                  Facsimile: (415) 421-7105
                                                  tschneider@schneiderwallace.com

                                                  Todd S. Collins
                                                  Shanon J. Carson*
                                                  Ellen T. Noteware
                                                  BERGER & MONTAGUE, P.C.
                                                  1622 Locust Street
                                                  Philadelphia, PA 19103-6365
                                                  tcollins@bm.net
                                                  scarson@bm.net
                                                  enoteware@bm.net

Steven A. Schwartz*
Andrew W. Ferich*
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633
steveschwartz@chimicles.com
awf@chimicles.com

and

Robert J. Kriner, Jr.*
A. Zachary Naylor*
CHIMICLES & TIKELLIS LLP
222 Delaware Avenue, Suite 1100
Wilmington, DE 19801
Tel.: 302-656-2500
Fax: 302-656-9053
rjk@chimicles.com
zn@chimicles.com

John J. Carey
John F. Garvey
James J. Rosemergy
CAREY, DANIS & LOWE
8235 Forsyth Boulevard
Suite 1100
Clayton, MO 63105
Tel.:  314-725-7700
Fax:  314-721-0905
jcarey@careydanis.com
jgarvey@careydanis.com
jrosemergy@careydanis.com

*Attorneys for Plaintiffs*

*Pro Hac Vice application forthcoming

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing was filed using the Court's ECF system on

August 21, 2017, and served upon all counsel of record thereby.


/s/ John F. Edgar_____