# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| LATASHA DAVIS, JENNIFER ELLIOTT, and MARLA ALIECE SIMS-KING, individually and as representatives of a class of participants and beneficiaries in and on behalf of the WASHINGTON UNIVERSITY RETIREMENT SAVINGS PLAN, | ) ) ) ) ) ) ) | Case No. 4:17-cv-01641-RLW  [*consolidated with* Case No. 4:17-cv-1785] |
| *Plaintiffs*, | ) ) ) | |
| vs. | ) ) | |
| WASHINGTON UNIVERSITY IN ST. LOUIS and WASHINGTON UNIVERSITY IN ST. LOUIS BOARD OF TRUSTEES, | ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Brian T. Ortelere (*pro hac vice*)
Jeremy P. Blumenfeld (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
Tel.: 215-963-5000
Fax: 215-963-5001
brian.ortelere@morganlewis.com
jeremy.blumenfeld@morganlewis.com

Christopher A. Smith
HUSCH BLACKWELL
The Plaza in Clayton
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel.: 314-480-1836
Fax: 314-480-1505
chris.smith@huschblackwell.com

Deborah S. Davidson (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
Tel.: 312-324-1000
Fax: 312-324-1001
deborah.davidson@morganlewis.com
matthew.russell@morganlewis.com

*Counsel for Defendants Washington*
*University in St. Louis and Washington*
*University in St. Louis Board of Trustees*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

I.      SECTION 403(B) PLANS ......................................................................................... 3

II.     KEY FACTS REGARDING THE PLAN .................................................................. 4

       A.     The Plan's Investment Menu ........................................................................ 4

       B.     Expense Ratios Associated With The Plan's Investment Options Cover
             The Plan's Investment and Recordkeeping Fees ......................................... 6

       C.     Wash U Repeatedly Selected Lower-Cost Share Classes And, Effective In
             June 2016, Consolidated To TIAA As A Single Recordkeeper ..................... 7

       D.     TIAA Loan Program ..................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.      PLAINTIFFS FAIL TO STATE A VIABLE CLAIM FOR BREACH OF
      FIDUCIARY DUTY .................................................................................................. 9

       A.     Plaintiffs Fail To State A Viable Claim That Wash U Allowed Participants
             To Pay Excessive Investment And Recordkeeping Fees ................................... 11

            1.     The Plan's Total Expense Ratios Are Better Than Those In Cases
                    Other Courts Have Dismissed .................................................................. 11

            2.     Plaintiffs' Critique Of The Investment Share Classes Offered On
                    The Plan's Investment Menu Fails To State A Viable Claim ................. 14

       B.     Plaintiffs' Challenges To The Plan's Recordkeeping Structure Fail ................. 15

       C.     Selecting Bundled Products And Services Is Not A Fiduciary Breach .............. 17

       D.     Plaintiffs' "Underperformance" Allegations Fail To State A Plausible
             Claim .......................................................................................................... 18

            1.     Plaintiffs' CREF Stock Account Allegations Fail ................................. 19

            2.     Plaintiffs' Challenge To The TIAA Real Estate Account Fails .............. 21

       E.     Plaintiffs' Challenge To The TIAA Traditional Annuity Fails .......................... 22

II.     PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS FAIL AS A MATTER
     OF LAW .................................................................................................................. 23

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................9, 24

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...........................................................................................9

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) ...............................................................12, 13, 14

*Chao v. Merino,*
   452 F.3d 174 (2d Cir. 2006) .............................................................................23

*Conkright v. Frommert,*
   559 U.S. 506 (2010) .........................................................................................10

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009) ..................................................................... passim

*In re Unisys Savings Plan Litig.,*
   173 F.3d 145 (3d Cir. 1999) .............................................................................19

*Jenkins v. Yager,*
   444 F.3d 916 (7th Cir. 2006) .......................................................................19, 22

*Leimkuehler v. Am. United Life Ins. Co.,*
   713 F.3d 905 (7th Cir. 2013) ..............................................................................7

*Loomis v. Exelon Corp.,*
   658 F.3d 667 (7th Cir. 2011) ..................................................................... passim

*Meiners v. Wells Fargo & Co.,*
   2017 WL 2303968 (D. Minn. May 25, 2017) ...........................................3, 19, 21

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.
Mgmt. Inc.,*
   712 F.3d 705 (2d Cir. 2013) .......................................................................10, 19, 22

*Renfro v. Unisys,*
   671 F.3d 314 (3d Cir. 2011) ...................................................................... passim

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   2016 WL 7494320 (D. Conn. Dec. 30, 2016), *appeal docketed* No. 17-239 (2d
   Cir.) ..............................................................................................................................15

*Sacerdote v. New York Univ.*,
   2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017).........................................9, 14, 16, 18

*Sweda v. Univ. of Penn.*,
   2017 WL 4179752 (E.D. Pa. Sept. 21, 2017) ................................................. passim

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823
   (2015)....................................................................................................1, 11, 21

*Tussey v. ABB Inc.*,
   746 F.3d 327 (8th Cir. 2014) .......................................................................... passim

*Tussey v. ABB, Inc.*,
   850 F.3d 951 (8th Cir. 2017) ...........................................................................20, 21

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016), *appeal docketed* No. 17-16208
   (9th Cir.).......................................................................................................... passim

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017) .......................................................15

*Young v. Gen. Motors Inv't Mgmt. Corp.*,
   325 F. App'x 31 (2d Cir. 2009) .............................................................................17

STATUTES

26 U.S.C. § 403(b) ..............................................................................................................3

29 U.S.C. § 1104(a)(1)...............................................................................................1, 9, 17

29 U.S.C. § 1106(a)(1)...................................................................................................23, 24

29 U.S.C. § 1108(b)(1) .................................................................................................. 24-25

29 U.S.C. § 1108(b)(17) ....................................................................................................24

29 U.S.C. § 1109(a) ...........................................................................................................10

Tech. Amends. Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat. 1606 (1958)
   (codified in IRC § 403(b)) ....................................................................................3

REGULATIONS

29 C.F.R. § 2550.408b-1 .......................................................................................... 24-25

Mo. Code Regs. Ann. Tit. 20, § 400-1.090(2), 20 C.S.R. § 400-1.090(2) ...................................24

OTHER AUTHORITIES

AonHewitt, InBrief, *TIAA-CREF Asset Mgmt.* (July 2012),
    http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-
    1094320FC2037740 ......................................................................................................22

CREF Stock Acct. (R3) Fact Sheet (as of June 30, 2017),
    https://www.tiaa.org/public/pdf/ffs/194408126.pdf ...............................................19

DOL Adv. Council, *Current Challenges and Best Practices for ERISA
    Compliance for 403(b) Plan Sponsors* (Nov. 2011),
    https://www.dol.gov/ebsa/publications/2011ACreport1.html ...................................6

DOL Info. Ltr. (Dec. 22, 2016),
    www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/information-
    letters/12-22-2016 ......................................................................................................5

DOL, *Understanding Ret. Plan Fees and Expenses* (Dec. 2011),
    https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-
    activities/resource-center/publications/understanding-retirement-plan-fees-
    and-expenses.pdf.........................................................................................................6

Fed. Reserve Bank of St. Louis, *Economic Research: Moody's Seasoned AAA
    Corp. Bond Yield*, https://fred.stlouisfed.org/series/AAA .......................................24

Financial Times, Quote: CREF Stock Account Class R3, "Summary" and
    "Ratings" tabs, https://markets.ft.com/data/funds/tearsheet/ratings?s=QCSTIX ...................20

Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper, Univ. of Notre Dame*
    (Feb. 2014), https://wpspreview.fidelity.com/bin-
    public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesig
    n%20White%20Paper.pdf..........................................................................................14

Highlights of GAO-16-433,
    http://www.gao.gov/assets/680/678925.pdf.............................................................4

Bankrate Loan Calculator,
    http://www.bankrate.com/calculators/managing-debt/loan-calculator.aspx..........................25

Notre Dame 403(b) Plan Transition Guide (2014),
    https://wpspreview.fidelity.com/bin-
    public/070_NB_PreLogin_Pages/documents/ND_Roth_FLY.pdf.........................................16

Saxon, S. & Powell, D., *Preparing Educational & Nonprofit Employees for Retirement: 403(b) Plans and ERISA Fiduciaries*, Journal of Taxation, 127 J. Tax'n 53, 2017 WL 3206157 (Aug. 2017) ................................................................4

SEC, *Fast Answers: Annuities*  (Apr. 6, 2011), https://www.sec.gov/answers/annuity.htm ...............................................................4

SEC, *Fast Answers: Variable Annuities* (modified May 3, 2012), www.sec.gov/fast-answers/answersvarannhtm.html ..................................................5

TIAA, *Awards and Recog.*, www.tiaa.org/public/about-tiaa/awards-recognition......................................................4

TIAA, *Loan FAQs*, www.tiaa.org/public/support/faqs/loans ...................................................................9

TIAA Real Estate Acct. Prospectus (May 1, 2017), https://www.tiaa.org/public/pdf/realestate_prosp.pdf.............................................21

TIAA, *Take a Loan*, https://www.tiaa.org/public/advisors/guidance/take-a-loan ...................................24

TIAA, *TIAA Traditional Annuity: Adding Safety and Stability to Retirement Portfolios* (Apr. 2017), https://www.tiaa.org/public/pdf/compliance/tiaa-traditional-white-paper.pdf .......23

TIAA Trad. Annuity Fact Sheet at 2 (June 30, 2017), https://www.tiaa.org/public/pdf/ffs/878094101-GRA.pdf.......................................6

TIAA, *Why TIAA*,  https://www.tiaa.org/public/why-tiaa/why-we-are-different ....................................4

Vanguard PRIMECAP Fund Prospectus, at 13 (Jan. 27, 2017), https://www.vanguard.com/pub/Pdf/p059.pdf.........................................................7

Vanguard REIT Index Fund Prospectus (Sept. 26, 2017), https://personal.vanguard.com/pub/Pdf/i3123.pdf?2210120737 ...........................21

Wash U Plan Loan Guidelines (2017), https://hr.wustl.edu/benefits/Documents/WUSTL_Updated_Loan_Policy_Statement.pdf ..........................................................................................................9

Wash U Plan Website, https://www.tiaa.org/public/tcm/wustl/investment-options/plan1 ............................5

Wash U SPD at 10-11 (Jan. 1, 2014), https://hr.wustl.edu/benefits/Documents/RetirePlanDoc.pdf...................................5

## INTRODUCTION

This lawsuit is a copycat of more than a dozen actions filed against some of the nation's preeminent private universities.  Plaintiffs allege that Washington University in St. Louis and its Board of Trustees (collectively, "Wash U") breached their fiduciary duties under the Employee Retirement Income Security Act ("ERISA") with respect to the Wash U Retirement Savings Plan ("Plan").  In effect, plaintiffs seek to rewrite ERISA's fiduciary duties into a series of rigid, *post hoc* rules that would restrict a fiduciary's discretion in offering participants meaningful choices from an investment menu tailored to a plan's unique participant population; require fiduciaries to prioritize cost reduction over all other considerations; and effectively mandate, in every instance, the same narrow investment menu and administrative structure plaintiffs apparently prefer.

The Court should reject this invitation, as such an approach is antithetical to the fiduciary discretion recognized by the Eighth Circuit, *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014), and stands in conflict with the dismissal of similar claims by several Circuit courts, *See Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015); *Renfro v. Unisys*, 671 F.3d 314 (3d Cir. 2011); *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009).  Indeed, a district court recently dismissed nearly identical claims involving the University of Pennsylvania 403(b) plan.  *Sweda v. Univ. of Penn.*, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017).  Moreover, this is not a typical class action involving allegations that participants lost their retirement savings—in fact, the Complaint does not even allege any member of the putative class suffered investment losses at all.  To the contrary, participants earned sizeable profits by investing in the Plan, and this case is only about hindsight-driven allegations that those profits could have been even higher.

Plaintiffs' claims fail as a matter of law.  ERISA affords fiduciaries substantial discretion to administer a plan best suited to its participants under "the circumstances then prevailing."  29 U.S.C. § 1104(a)(1)(B).  Discretion is the hallmark of fiduciary conduct, which the Eighth Circuit directs courts to review only for an abuse of that discretion.  *Tussey*, 746 F.3d at 333-35.

– 1 –

To state a viable claim, therefore, plaintiffs cannot simply disagree with Wash U's decisions or point to supposedly poor *results*. Rather, they must plausibly allege context-specific facts from which this Court may reasonably infer Wash U's fiduciary process was flawed or that its conduct fell beyond the range of reasonable choices a fiduciary could make under like circumstances. The Consolidated Class Action Complaint ("Complaint") contains nothing of the sort.

   **Counts I and II, "Excessive Fees."**  The Complaint's core contention is that Wash U breached its ERISA duties of prudence and loyalty by causing participants to pay "excessive" investment management and recordkeeping fees through the expense ratios charged by the Plan's investment options.[1]  However, the Plan's investment lineup offers meaningful choice from an array of asset classes, investment styles, annuity options, and fee profiles—and the Plan's all-in fees (ranging from 0.04% to 0.85%) are *better* than those approved in the above-cited cases.  In other words, participants, who bear the risk of loss and themselves have differing investment horizons and risk tolerances, are given a wide array of options from which they can precisely tailor the portfolio appropriate for each of them.  Courts should not second-guess the fiduciaries' discretionary judgments at the threshold in furtherance of plaintiffs' myopic focus on fees.  In any event, Wash U has taken many of the very actions plaintiffs claim it should have, including consolidating to one recordkeeper and offering *dozens* of low-cost institutional investments.

   **Count II, "Underperformance."**  Plaintiffs also allege that two of the Plan's more than 100 investment options "underperformed" over the alleged class period, as compared to hand-picked "benchmarks."  Plaintiffs surmise from this that Wash U's review process must have been flawed.  But the law is clear that plaintiffs cannot state a viable claim merely by focusing on the outcome of an investment or faulty comparators—prudence does not require prescience, nor is hindsight the appropriate vantage point from which to review such claims.  Regardless, plaintiffs compare apples to oranges by relying upon the *wrong* benchmarks.  In any event, the Complaint

---

[1]  An expense ratio is a charge expressed as a percentage of an investor's fund holdings.  For example, a participant who invests $1,000 in a fund with an expense ratio of 0.10% would be charged an annual fee of $1 ($1,000 x .001).

does not even allege anyone actually *lost* money by investing in the Plan.  *See Sweda*, 2017 WL 4179752, at *5, 10 ("[T]here is no cause of action in ERISA for 'underperforming funds.'").

**Counts III and IV, "Prohibited Transactions."**  Finally, the Court should dismiss plaintiffs' "prohibited transaction" claims because the Complaint contains no factual allegations at all describing the loan program that plaintiffs purport to challenge, and plaintiffs fail to articulate a plausible violation of ERISA, which specifically exempts participant loans from the prohibited-transaction rules, and the loan program at issue is lawful regardless.

## FACTUAL BACKGROUND[2]

### I.    Section 403(b) Plans.

A "403(b)" plan is a tax-sheltered annuity retirement program available to employees of nonprofit, charitable, religious, medical, and educational entities like Wash U.  *See* 26 U.S.C. § 403(b)(1)(A).  403(b) plans are similar to 401(k) plans, but with important differences.  403(b) plans initially could offer only annuities, which provide a stream of monthly payments for life— or for a fixed term of years—depending on the contract and individual choices.[3]  Congress amended Section 403(b) in 1974 to allow 403(b) plans to offer mutual funds.  *See* 26 U.S.C. § 403(b)(7).  Section 403(b), which remains entitled "Taxation of employee annuities," does not allow for other investment vehicles available to 401(k) plans, such as "commingled trusts."  *Id.*

In the typical 401(k) plan, participants must take their account balance at retirement in a lump sum.  The participants then need to ensure they have sufficient funds to last through

---

[2] In deciding a motion to dismiss, the Court may "consider matters of public record and materials that are 'necessarily embraced by the pleadings.'"  *Meiners v. Wells Fargo & Co.*, 2017 WL 2303968, at *2 (D. Minn. May 25, 2017) (quotations omitted).  In ERISA cases, courts often consider the plan and plan-related documents, statutorily required disclosures, IRS/DOL Form 5500s, and investment fund prospectuses.  *Id.* (considering fund prospectuses); *see also Hecker*, 556 F.3d at 582-83 (plan summaries and prospectuses); *White v. Chevron Corp.*, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) (plan documents and Form 5500 filings), *appeal docketed* No. 17-16208 (9th Cir.).  Here, plaintiffs have expressly incorporated this information into the Complaint, either by direct reference or by their assertion that their Complaint is based upon, *inter alia*, "Plan filings with the [DOL], other publicly available documents, documents provided to Plaintiffs as Plan participants," and similar information. Compl. ¶ 13; *id.* ¶¶ 62-63, 67-71 (relying on Form 5500s, fund prospectuses, and participant disclosures); *Sweda*, 2017 WL 4179752, at *2 (finding similar complaint incorporated same types of 403(b) plan documents).

[3] Tech. Amends. Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat. 1606 (1958) (codified in IRC § 403(b)).  For the Court's convenience, the exhibits referenced herein are attached to and described in the accompanying Index.

retirement, *i.e.,* that they do not outlive their retirement nest egg.  By contrast, in a typical 403(b) plan, participants can elect to receive their benefits as an annuity by investing in one or more annuity options offered by the plan, as set forth in the contracts with the plan's annuity provider.[4]

Established in 1918, TIAA is among the most highly-regarded and lowest-cost providers of annuity products to 403(b) plans.  Not only has TIAA been named the "Best Overall Large Fund Company" by Lipper for five years running, but over 70% of all TIAA-CREF funds and variable annuities received a Morningstar rating of 4 or 5 stars based on their 2017 performance.[5] TIAA annuities also have among the lowest costs in the entire industry.[6]

## II.    Key Facts Regarding The Plan.

Wash U employees have access to a range of benefits, including the opportunity to save for retirement in the Plan.  Participants can defer a portion of their compensation into the Plan on a tax-deferred basis, and if an employee makes a minimum required contribution, the University contributes an amount equal to between 7% and 11.5% of the participant's salary.  Compl. ¶ 17.

### A.    The Plan's Investment Menu.

By express design, the Plan provides a menu of investment options from TIAA and Vanguard, offering participants the option to invest in tax-deferred annuities through TIAA and mutual funds through either TIAA or Vanguard.[7]  Each participant is responsible for deciding in

---

[4] *See* Ex. A, SEC, *Fast Answers: Annuities* (Apr. 6, 2011), https://www.sec.gov/answers/annuity.htm.  Academic faculty often change institutions over their careers, and annuities historically served as portable, individual contracts with an insurance carrier that would ensure steady retirement income regardless of the employer.  *See* Saxon, S. & Powell, D., *Preparing Educational & Nonprofit Employees for Retirement: 403(b) Plans and ERISA Fiduciaries*, Journal of Taxation, 127 J. Tax'n 53, 55, 2017 WL 3206157, at *3 (Aug. 2017).  Thus, 403(b) plan participants have come to expect retirement benefits through lifetime annuity payments.  In contrast, the GAO has identified the *absence* of annuity options in 401(k) plans as a *flaw* in such plans' ability to provide retirement income security. *See* Ex. B, Highlights of GAO-16-433, http://www.gao.gov/assets/680/678925.pdf (last visited Oct. 4, 2017).

[5] *See* TIAA, *Awards and Recog.*, www.tiaa.org/public/about-tiaa/awards-recognition (last visited Oct. 4, 2017).

[6] *See* TIAA, *Why TIAA*, at n.2 https://www.tiaa.org/public/why-tiaa/why-we-are-different (last visited Oct. 4, 2017) ("The expense ratio on all mutual fund products and variable annuity accounts managed by TIAA-CREF is generally *less than half* the mutual fund industry average.  60% are *less than half* their respective Morningstar Universe average, and 50% are *less than half* of their respective Morningstar Universe median.") (emphases added).

[7] *See* Compl. ¶¶ 30-31; Ex. C, Plan Document, § 1.12 & Appx. B (establishing TIAA and Vanguard as the approved "Fund Sponsors" for the Plan).

which of the Plan's array of options to invest and may change investments at any time.[8]  The

Plan offers 36 TIAA options and 83 Vanguard mutual funds.  Compl. ¶ 99.  These options are

organized into four tiers, in recognition of the individualized considerations bearing on an

optimal portfolio.  Tier 1 consists of TIAA "Lifecycle" and Vanguard "Target Date" funds for

participants who prefer a "Hands-Off Approach"; Tier 2 includes a variety of actively-managed

funds across asset classes and investment strategies; Tier 3 offers low-cost, passively-managed

"index" funds in each major asset class;[9] and Tier 4, a "Guaranteed Option," is the TIAA

Traditional Annuity.[10]  As of the end of 2016, participants chose to invest roughly 70% of total

Plan assets in TIAA options, and 30% in Vanguard funds.[11]

Eight of the Plan's available options are TIAA variable annuities.  Compl. ¶ 34.  Unlike a

mutual fund, a variable annuity is based on a contract between the employee and an insurance

company, whereby the latter agrees to make periodic payments based on the value of the

underlying contract (and any investment returns) at the time payments begin.[12]  By providing for

a payment stream at retirement, variable annuities ensure an employee does not outlive his or her

retirement savings and, of course, require some additional expense so TIAA may ensure those

payments—making these products readily distinguishable from ordinary mutual funds.[13]

The Plan also offers participants the option of investing in the TIAA Traditional Annuity,

which is "a fixed annuity contract that returns a contractually specified minimum interest rate."

---

[8] Ex. D, Wash U SPD at 10-11 (Jan. 1, 2014), https://hr.wustl.edu/benefits/Documents/RetirePlanDoc.pdf.

[9] Index funds "do not make any independent investment choices but simply track a designated portfolio such as the Standard & Poor's 500 Index[.]"  *Loomis*, 658 F.3d at 669-70.  For actively managed funds, "the fund's investment advisers try to find and buy underpriced securities while selling ones that the advisers think are overvalued[.]"  *Id.*

[10] Wash U Plan Website, https://www.tiaa.org/public/tcm/wustl/investment-options/plan1 (last visited Oct. 4, 2017).

[11] *See* Ex. E, 2016 Form 5500 at Sched. H, line 4i (providing assets in each of the Plan's investment options).

[12] *See* Ex. F, 2016 404a-5 Fee Discl. at 44 (describing lifetime income options); *see also* Ex. G, SEC, *Fast Answers: Variable Annuities* (modified May 3, 2012), www.sec.gov/fast-answers/answersvarannhtm.html.

[13] In fact, DOL guidance to TIAA indicated that the DOL, "along with the Treasury Department and other stakeholders, identified the need for lifetime income as an important public policy issue and has supported initiatives that could lead to *broader use* of lifetime income options in defined contribution plans as a supplement to and enhancement of accumulation of retirement savings."  Ex. H, DOL Info. Ltr. (Dec. 22, 2016) (emphasis added), www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/information-letters/12-22-2016.

Compl. ¶ 32.  Unlike a variable annuity, the Traditional Annuity guarantees a minimum rate of 3.0%, although the actual rate applied in each year at issue here has been greater.[14]

## B. Expense Ratios Associated With The Plan's Investment Options Cover The Plan's Investment and Recordkeeping Fees.

There are costs associated with administering a 403(b) plan.  Recordkeeping any defined contribution retirement plan generally requires maintaining up-to-date account records; processing daily transactions; generating reports and account statements; executing fund transfers and exchanges; issuing communications to participants; maintaining the Plan's website; and fulfilling tax-reporting requirements.  Some recordkeepers (like TIAA), at additional cost, also provide more extensive services, such as investment and retirement counseling for participants, compliance monitoring to assist the plan and its fiduciaries, and other services.[15]

Recordkeeping a plan offering annuity contracts (like the Plan here) involves other unique complexities.  Among other things, the recordkeeper must process each participant's annuity contract application, track each participant's annuity premium payments, apply the corresponding crediting rate for each premium payment, and manage the annuity's ultimate payout terms—all of which is dictated by the underlying contract(s) issued to each participant.[16]

While the Complaint notes that Vanguard and TIAA "recordkeep" their respective investment options offered in the Plan, Compl. ¶ 55, missing are any allegations about the scope of services they provide (which can vary widely across plans and participant populations).  What is clear, however, is that participants are not charged directly for recordkeeping services.  Rather, all of the costs associated with participants' Plan investments—including the investment and

---

[14] *See* E, 2016 Form 5500, Fin. Stmt. Notes at 9; Ex. I, TIAA Trad. Annuity Fact Sheet at 2 (June 30, 2017), https://www.tiaa.org/public/pdf/ffs/878094101-GRA.pdf (reflecting actual rates ranging from 3.25% to 4.5%).

[15] *See* Ex. F, 2016 404a-5 Fee Discl. at 2-4; *see also* Ex. J, DOL, *Understanding Ret. Plan Fees and Expenses* ("DOL Fee Brochure"), at 3-5 (Dec. 2011), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

[16] *See, e.g.*, Ex. F, 2016 404a-5 Fee Discl. at 2-4; *see also* Ex. J, DOL Fee Brochure, at 8 (discussing annuities); Ex. K, DOL Adv. Council, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors*, at 6-7, 10-13, 17, 20-22 (Nov. 2011), https://www.dol.gov/ebsa/publications/2011ACreport1.html (discussing complexities associated with annuities and "substantial differences between 403(b) and 401(k) plans").

recordkeeping fees at issue here—are covered by the expense ratios charged by the Plan's various options, through a practice known as "revenue sharing."[17]  The Plan's expense ratios thus constitute a single all-in fee for Plan participation.

Plan participants can choose from over 100 investment options with expense ratios ranging from just 0.04% to 0.85%.  *See* Compl. ¶ 99.  Nearly *50* of the Plan's investment options (or 42%) charge expense ratios of 0.10% or lower, and only *one* charges more than 0.51%.  The Plan's average expense ratio is 0.21%, having declined steadily over the alleged class period:[18]

| Year | Low | High | Average |
|------|------|------|---------|
| 2017 | 0.04% | 0.85% | 0.21% |
| 2016 | 0.03% | 0.86% | 0.22% |
| 2015 | 0.04% | 0.86% | 0.27% |
| 2014 | 0.05% | 0.89% | 0.29% |
| 2013 | 0.05% | 0.92% | 0.30% |
| 2012 | 0.05% | 0.95% | 0.31% |
| 2011 | 0.07% | 0.98% | 0.32% |

C.   **Wash U Repeatedly Selected Lower-Cost Share Classes And, Effective In June 2016, Consolidated To TIAA As A Single Recordkeeper.**

The Complaint and publicly available information establish that Wash U offered lower-cost "institutional" share classes of many of the Plan's investment options and continuously acted to reduce Plan expenses over the alleged class period.[19]  As noted, participants directed the vast majority of the Plan's assets into TIAA options, and—as plaintiffs concede—the Plan at *all* relevant times offered the lowest-cost "Institutional" shares for *every* available TIAA mutual fund and the lowest-cost version available of *every* CREF variable annuity.[20]

As for Vanguard, it "provides services to its member funds on an at-cost basis, with no profit component, which helps to keep the funds' expenses low."[21]  Still, Wash U offered lower-

---

[17] Compl. ¶ 42.  Revenue sharing is "an arrangement allowing mutual funds to share a portion of the fees that they collect from investors with entities that provide services to the mutual funds, the investors, or both."  *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013).

[18] *See* Ex. L, Summary of Wash U Investment Options, 2011-2017 ("Summary of Investments").

[19] *See* Compl. ¶¶ 35-36, 92, 96, 98-99; *see also* Ex. L, Summary of Investments.

[20] *See* Compl. ¶¶ 35, 96; Ex. L, Summary of Investments; Ex. M, Wash U Plan Funds in Non-Retail Share Classes.

[21] Ex. N, Vanguard PRIMECAP Fund Prospectus, at 13 (Jan. 27, 2017), https://www.vanguard.com/pub/Pdf/p059.pdf.

cost share classes of several Vanguard funds over time.  In 2013, the Plan converted the five

most popular Vanguard funds into non-retail shares, representing around $237 million of the

$872 million in total assets held in Vanguard funds.[22]  In 2014, the Plan converted two of those

options to even lower-cost Admiral shares, and in 2015, the Plan moved to the "Institutional"

versions of all twelve Vanguard "Target Retirement" date funds offered under the Plan.[23]  As of

today, the Plan offers a lower-cost, non-retail share class of 94 of the 95 funds for which a non-

retail share class is available.  *See* Ex. M, Wash U Plan Funds in Non-Retail Share Classes.

 Effective June 7, 2016, Wash U consolidated the Plan's recordkeeping services to TIAA

as the sole recordkeeper, which assumed administrative responsibilities for the Plan's Vanguard

funds.  Compl. ¶ 87; Ex. E, 2016 Form 5500, Fin. Stmt. Notes, at 5.  In conjunction with this

step, Wash U was able to convert dozens more Vanguard funds to lower-cost share classes.[24]

### D.   TIAA Loan Program.

 As in most participant-directed retirement savings plans, Plan participants may take loans

against the assets in their accounts.  Until TIAA became the sole recordkeeper in 2016, a

participant could take a loan from either TIAA or Vanguard.[25]  Under TIAA's loan program,

participants transfer 110% of the loan amount from their chosen investment options to the

Traditional Annuity as collateral.  That collateral earns a return (again, a guaranteed three

percent minimum, which consistently has been higher) while the recipient repays the loan, with

interest.  Assuming the loan is repaid on time (a maximum of five years), all collateral will be

credited back to the participant's account, along with interest earned on those assets.  As

---

[22] *See* Ex. L, Summary of Investments; Ex. O, 2013 Summary of Plan Servs. & Costs at 7; *see also* Ex. P, 2013 Form 5500, Sched. H, line 4i (showing assets invested in each fund).

[23] Ex. Q, 2014 404a-5 Fee Discl. at 6; Ex. R, 2015 404a-5 Fee Discl. at 4-5; *see* Ex. L, Summary of Investments.

[24] *See* Ex. L, Summary of Investments (reflecting the lower-cost Vanguard options in 2016-17); Ex. M, Plan Funds in Non-Retail Share Classes.  In fact, the Complaint tacitly concedes Wash U moved at least 40-45 Vanguard funds to lower-cost shares in 2016, by alleging the 2016 Fee Disclosure "identif[ies] 160 investment options," while the Form 5500 lists "roughly 115-120" options.  Compl. ¶ 7.  The Fee Disclosure, however, lists *both* share classes of the funds Wash U offered during the year, including those that were migrated to lower-cost shares (*i.e.*, before and after the changes).  Ex. F, 2016 404a-5 Fee Discl.

[25] Ex. D, SPD at 12; Ex. Q, 2014 404a-5 Fee Discl. at 3, 5.

compensation for administering the loan program, TIAA keeps the "spread" between the amount the participant paid in interest and the amount earned from the Traditional Annuity.[26]

Unlike the TIAA loan program, Vanguard charged an origination fee of either $50 or $75, and also charged a $50 fee each year to maintain or administer the loan.[27]

## ARGUMENT[28]

## I.     Plaintiffs Fail To State A Viable Claim For Breach Of Fiduciary Duty.

Counts I and II allege that Wash U breached its fiduciary duties of prudence and loyalty in violation of ERISA Section 404.[29]  To state a claim of imprudence, plaintiffs must offer factual allegations plausibly showing that Wash U did not "act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  By definition, ERISA's "prudent person standard is an objective standard that focuses on the fiduciary's conduct preceding the challenged decision—not the results of that decision."  *Tussey,* 746 F.3d at 335.

Accordingly, it is not enough to disagree with or second-guess a fiduciary's decisions. To the contrary, where a plan confers discretion upon the fiduciary—as the Plan does here[30]—

---

[26] *See* Compl. ¶ 210; Ex. F, 2016 404a-5 Fee Discl. at 2; Ex. S, Wash U Plan Loan Guidelines (2017), https://hr.wustl.edu/benefits/Documents/WUSTL_Updated_Loan_Policy_Statement.pdf; *see also* TIAA, *Loan FAQs*, www.tiaa.org/public/support/faqs/loans (last visited Oct. 4, 2017).

[27] *See, e.g.*, Ex. Q, 2014 404a-5 Fee Discl. at 5; Ex. R, 2015 404a-5 Fee Discl., at 3.

[28] Rule 12(b)(6) requires dismissal if a complaint lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  In applying this standard, the Court must disregard any allegations that are "no more than conclusions" and thus "not entitled to the assumption of truth."  *Id.*  Then, from any remaining well-pleaded allegations, plaintiffs must establish "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[29] The title of Counts I and II suggests plaintiffs also bring claims for breaches of the duty of loyalty, which requires fiduciaries to act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1)(A).  However, the Complaint pleads no facts to support a separate loyalty claim, distinct from their prudence claims.  This is insufficient to state an independent claim.  *See Loomis*, 658 F.3d at 671 (affirming dismissal of disloyalty claim where complaint alleged no facts that defendant selected investment options "to enrich itself at participants' expense"); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017) (to state a disloyalty claim, "a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts").

[30] Ex. C, Plan § 8.2 (granting Washington University "discretionary and final authority" over Plan administration, further stating that "[a]ny determination made by the University shall be given deference, if it is subject to judicial review, and shall be overturned only if it is arbitrary or capricious").

the fiduciary is "entitle[d] . . . 'to deference in exercising that discretion.'"  *Id.* at 333 (quoting *Conkright v. Frommert*, 559 U.S. 506, 509 (2010)).  Thus, a fiduciary's decision-making is reviewed only for abuse of discretion, a "deferential standard [that] reflects our general hesitancy to interfere with the administration of a benefits plan."  *Id.* at 335 (quotations omitted).  Under this standard, a fiduciary's decision "will not be disturbed if reasonable," meaning it is not "invalid merely because [a court] disagree[s] with it."  *Id.* at 334-35 (alterations in original).  Rather, discretionary fiduciary conduct "is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him."  *Id.* (emphasis in original).

Moreover, where, as here, a complaint contains no allegations as to the actual process a fiduciary employed, plaintiffs must allege sufficient facts from which the Court may reasonably *infer* the decision-making process was unreasonably flawed.  *See, e.g.*, *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (a complaint lacking allegations regarding the fiduciary process may survive dismissal only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed"); *Renfro*, 671 F.3d at 327 ("[W]e are unable to infer from what is alleged that the process was flawed.") (quotations omitted).

Ultimately, these abuse-of-discretion principles strike an appropriate balance that "stops plan participants from second-guessing a plan fiduciary's investment decisions just because they lose money, while allowing plan participants latitude to bring suit for improper management."  *Sweda*, 2017 WL 4179752, at *5.  And this framework applies with even greater force here than as stated in *Sweda*, as plaintiffs do not even claim to have "*los[t]* money" in any actual sense, but rather speculate that other hypothetical approaches would have been cheaper or better.[31]  Opportunity-cost "losses" like these should not distract from the necessary balancing applied in *Sweda*.  As shown below, the Complaint falls far short of these standards.

---

[31] *See also* 29 U.S.C. § 1109(a) (fiduciary is liable only for a breach causing "losses to the plan *resulting from each such breach*") (emphasis added).

A. **Plaintiffs Fail To State A Viable Claim That Wash U Allowed Participants To Pay Excessive Investment And Recordkeeping Fees.**

1. **The Plan's Total Expense Ratios Are Better Than Those In Cases Other Courts Have Dismissed.**

As noted, Plan participants could select from a wide range of investment alternatives with reasonable, all-in expense ratios—including nearly 50 options below 0.10% and as low as 0.04% for those who want low-cost investments. And anyone who wants a TIAA annuity product—and the promise of an income stream at retirement—can select one at the lowest cost available. *Supra* at p.7. Particularly for a population as diverse as Wash U's Plan, offering such an investment menu is well within the range of reasonable actions a prudent fiduciary might take.

Faced with even less diversity of choice and higher expense ratios, numerous Circuit courts have dismissed similar claims. For example, in *Hecker*, the Seventh Circuit dismissed ERISA-fee claims where the plan offered 26 core investments charging fees between 0.07% and "just over" 1.00%, along with a brokerage window. 556 F.3d at 586. The Seventh Circuit reinforced this ruling in *Loomis*, affirming the dismissal of claims involving a plan that offered 32 mutual funds with expense ratios ranging from 0.03% to 0.96%. 658 F.3d at 671-73. The Ninth Circuit followed suit in *Tibble*, 729 F.3d at 1135, where the plan offered 51 investments with expense ratios of 0.03% to 2.00%. And in *Renfro*, the Third Circuit affirmed the dismissal of similar claims where the plan offered 73 options, nearly all retail share classes, with expense ratios ranging from 0.10% to 1.21%. The *Renfro* court emphasized that the duty of prudence requires offering "participants meaningful choices about how to invest their retirement savings" and a "reasonable mix and range of investment options." 671 F.3d at 327-28. The unifying principle underlying these holdings is that nothing suggests imprudence where the outcome is a reasonable, low-cost lineup allowing each participant to tailor his or her own preferred portfolio.

The same conclusion is warranted here. Not only does the Plan offer an even more diverse mix and range of options (including annuities), but Wash U took care to offer them across several tiers of investment styles tailored to the Plan's unique participant population,

comprised of thousands of University staff and faculty with varying levels of experience, risk tolerance, and investment acumen.[32]  Moreover, Wash U can hardly be faulted for constructing an investment menu that is *better* than ones the Third, Seventh, and Ninth Circuits already approved.  Indeed, the *Sweda* court dismissed nearly identical claims, where the Penn plan offered between 76 and 118 options from TIAA and Vanguard, with expense ratios equivalent to those here, ranging from 0.04% to 0.87%.  2017 WL 4179752, at *9.  As in *Sweda*, the Wash U Plan also offers dozens of options for below 0.10%, the *lowest*-cost option in *Renfro*.  *Id.*

The Eight Circuit's rulings in *Tussey* and *Braden v. Wal-Mart Stores*, 588 F.3d 585 (8th Cir. 2009), apply a similar analytical framework as in the above-cited cases.  The court in both instances turned first to the overall range of investments and expense ratios offered under each plan, before then evaluating the plausibility of the claims given that context.  *Tussey*, 746 F.3d at 335-36 (citing *Hecker*, *Loomis*, and *Renfro*); *Braden*, 588 F.3d at 595-96 & n.6 (citing *Hecker*).[33]

However, both *Tussey* and *Braden* exemplify what this case is *not* about, underscoring Wash U's position here.  In *Braden*, the Wal-Mart 401(k) plan offered only thirteen options, including ten exclusively retail mutual funds, allegedly chosen *because* they paid revenue sharing as part of a "kickback scheme" to benefit the plan trustee as "quid pro quo" for including funds in the plan.  *Id.* at 595-96 & n.6.  The Eighth Circuit expressly distinguished *Hecker*, finding that the "far narrower range of investment options" and more detailed allegations of a "kickback scheme" intended to benefit the plan's recordkeeper "makes more plausible the claim that this Plan was imprudently managed."  *Id.*  Then, in *Tussey*, the Eighth Circuit not only emphasized the discretion a fiduciary is owed in making investment decisions just like those here, *supra* at p.1, but, citing *Braden*, specifically highlighted "significant allegations of

---

[32] *See Sweda*, 2017 WL 4179752, at *2 (rejecting similar claims involving the Penn plan, noting participants ranged "from grounds and cleaning crews to renowned Wharton School and Law professors, physicists, anthropologists, hockey coaches and endless others").

[33] Indeed, the Third Circuit later noted that *Braden* adopted "a similar analytical framework" as in *Hecker* for evaluating these types of claims, looking first "to the characteristics of the mix and range of options and then evaluat[ing] the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options."  *Renfro*, 671 F.3d at 326.

wrongdoing" that *were not* at issue in *Hecker*, *Loomis*, and *Renfro*, including that defendants "used revenue sharing to benefit [itself] and Fidelity at the Plan's expense."  746 F.3d at 336.[34]

Plaintiffs allege nothing here akin to *Braden* or *Tussey*, nor can they.  Rather, the Plan's menu falls comfortably within the "reasonable mix and range of investment options" approved in the above cases—and it charges lower fees to boot.  Wash U thus "offered participants a menu that includes . . . high risk, and potentially high-return funds, together with low-expense index funds that track the market, and low-expense, low-risk, modest-return bond funds.  It has left choice to the people who have the most interest in the outcome, and it cannot be faulted for doing this."  *Loomis*, 658 F.3d at 673-74; *Hecker*, 556 F.3d at 586 ("[N]othing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund[.]").

Moreover, the Plan's expense ratios are consistent with or better than those in the other university 403(b) plans plaintiffs tout in the Complaint as being prudently managed.  Compl. ¶¶ 149-66.  Indeed, the average expense ratios in three of the five plans plaintiffs cite (Pepperdine, LMU, and CalTech) are still *double or more* than that of Wash U's Plan:[35]

|  | Wash U | Purdue | CalTech | Pepperdine | LMU | Notre Dame |
|---|---|---|---|---|---|---|
| Lowest Exp. Ratio | 0.04% | 0.04% | 0.04% | 0.03% | 0.03% | 0.04% |
| Highest Exp. Ratio | 0.85% | 1.09% | 1.00% | 1.13% | 1.09% | 0.63% |
| Average Exp. Ratio | 0.21% | 0.32% | 0.42% | 0.50% | 0.52% | 0.13% |

Notably, these five schools also made significant changes to their 403(b) plans paralleling those at Wash U.  Compl. ¶¶ 150-166.  In fact, Purdue used *five* recordkeepers before changes in 2011, while Pepperdine was using *four* recordkeepers.  *Id.* ¶¶ 156, 161.  That these schools may have been early in what the Complaint itself characterizes as "an accelerated evolution of the 403(b) marketplace" since 2009, *id.* ¶ 164, does not render Wash U's process imprudent or unreasonable with hindsight.  And although the current Notre Dame lineup is minimally cheaper

---

[34] *See also Sweda*, 2017 WL 4179752, at *5 (reconciling *Braden* with cases like *Renfro*, where the former alleged "a kickback scheme where the fiduciaries directly benefit at the expense of plan participants").

[35] Ex. T, Summary of Other University Plan Investment Options and Expense Ratios (listing all options available under each of the plans cited in plaintiffs' Complaint ¶¶ 149-66).

today than Wash U's, it had three recordkeepers and over 300 options until revamping its plan in 2015, when it began offering almost entirely Vanguard funds (and no variable annuities).[36]  Even still, the Wash U Plan offers many of the same Vanguard funds with expense ratios ranging from 0.04% to 0.51% (averaging just 0.16%)—roughly equal to Notre Dame—and yet continues to offer TIAA annuity and mutual fund options for those who want them.  *See* Ex. L, at 1; Ex. T.

Finally, there is no legal support for plaintiffs' assertion that offering participants choice from among many investments is imprudent.  Compl. ¶¶ 99-102 (alleging "too many" options).  The opposite is true:  ERISA "encourages [plan] sponsors to allow more choice to participants." *Loomis,* 658 F.3d at 673.  Indeed, the Eighth Circuit in *Braden* criticized the "relatively limited menu of funds" at issue in that case, which constituted just thirteen options.  588 F.3d at 596.[37]

> ### 2.   Plaintiffs' Critique Of The Investment Share Classes Offered On The Plan's Investment Menu Fails To State A Viable Claim.

Plaintiffs challenge the inclusion of some "retail" share classes of investments for which they claim lower-cost shares were available. Compl. ¶¶ 92-98.  However, courts soundly reject the notion that the mere inclusion of a fund with an expense ratio higher than that of the lowest share class automatically suggests imprudence.  *See, e.g.*, *Sacerdote*, 2017 WL 3701482, at *11 (holding that simply "identifying funds for which NYU included a higher-cost share class in the Plans instead of an identified available lower-cost share class . . . does not constitute evidence of imprudence"); *Sweda*, 2017 WL 4179752, at *9 ("Switching from retail to institutional shares is not a matter of checking a different box.").[38]  This Court should do the same.[39]

---

[36] *See* Compl. ¶¶ 164-66; Ex. T, Summary of Univ. Plans.  In fact, the source plaintiffs cite notes that a "multiple-recordkeeper model . . . has been the most prevalent in the higher-education marketplace."  Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper, Univ. of Notre Dame*, at 4 (Feb. 2014), https://wpspreview.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.

[37] *See Sweda*, 2017 WL 4179752, at *2, 9-10 (dismissed nearly identical claim, noting the "diverse array of beneficiaries" a university 403(b) plan serves); *Sacerdote,* 2017 WL 3701482, at *11 (same, involving NYU plan).

[38] *See also Loomis,* 658 F.3d at 669-72 (dismissing claims that fiduciaries failed to leverage the plan's buying power to offer lower-cost funds); *Hecker*, 556 F.3d at 586 (ERISA does not require the "cheapest possible" fund); *Renfro*, 671 F.3d at 318-19, 326-28 (rejecting claim that defendants could have leveraged the plan's "bargaining power" to secure more institutional share classes, and finding no basis for inferring a fiduciary breach because the plan already provided multiple "low-risk, low-cost" investments).

Dismissal is even more appropriate here because the Plan *already* offers scores of lower-cost shares (94 total, or roughly 81% of the lineup). Every TIAA option has been the lowest-cost class available over the entire alleged class period. *Supra* at p.7. Wash U migrated the Vanguard funds holding the most assets into lower-cost shares in 2013, and after consolidating to one recordkeeper, Wash U moved many other Vanguard funds to non-retail shares. *Id.* at pp.7-8. It is implausible to infer that Wash U has been monitoring Plan expenses for some funds but not others, and these facts belie any reasonable inference that Wash U's decision-making process was imprudent or an abuse of its discretion. *See Sweda*, 2017 WL 4179752, at *9 (the fact that Penn already offered 37 institutional share classes supports dismissal of similar claims).[40]

## B.    Plaintiffs' Challenges To The Plan's Recordkeeping Structure Fail.

Plaintiffs' critique of the Plan's use of the expense ratios as an all-in fee that paid revenue sharing—i.e., an "asset-based" structure—also does not state a plausible claim. Plaintiffs insist a better approach would have been to (1) impose separate, per-participant fees for recordkeeping services of no more than $35; and (2) have one entity recordkeep all Plan options (which Wash U in fact did in 2016). Compl. ¶¶ 35-36, 43, 48. The Court should reject these claims as well.

The Eighth Circuit and others have uniformly recognized that using revenue sharing to pay plan administrative expenses is common and "violates no statute or regulation." *Tussey*, 746 F.3d at 338; *Hecker*, 556 F.3d at 585; *see also Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016

---

[39] Indeed, the Complaint itself acknowledges there are good reasons for offering both retail and institutional share classes. *See* Compl. ¶ 43. Retail shares contribute a greater portion of their expense ratio for recordkeeping and other expenses. *Id.* Thus, including some retail shares in a plan lineup ensures the expense ratios will cover costs without the need to levy additional fees upon participants for recordkeeping services. *Id.* ¶¶ 43, 96; *White v. Chevron Corp. ("White II")*, 2017 WL 2352137, at *13-14 (N.D. Cal. May 31, 2017) (finding the fact that a retail share class pays revenue sharing to be the "obvious, alternative explanation" for including such shares). Thus, it is not enough to point to the inclusion of *some* retail share classes, alone, to reasonably infer imprudence. *Id.*

[40] Plaintiffs also wrongly suggest that TIAA misreported the expense ratios for Vanguard funds in the Plan. Compl. ¶¶ 68-71. Plaintiffs have misread the documents. The Plan's fee disclosures report each fund's expense ratio from the then-operative fund prospectuses, while plaintiffs (apparently, as they include no citation) base their allegations on the fund prospectuses released *after* the fee disclosures were made. *Compare, e.g.*, Ex. F, 404a-5 2016 Fee Discl. at 20 (showing expense ratio for Vanguard Intermediate-Term Bond Index, Investor as 0.20%, as of March 31, 2016), *with* Ex. U, Prospectus at 11, Vanguard Intermediate-Term Bond Index Fund (Apr. 28, 2015) (showing expense ratio of 0.20%), *and* Ex. V, Prospectus at 12, Vanguard Intermediate-Term Bond Index Fund (Apr. 26, 2016) (showing expense ratio of 0.16%, as reported in the chart in plaintiffs' Complaint ¶ 69).

WL 7494320, at *10 (D. Conn. Dec. 30, 2016) (collecting cases), *appeal docketed* No. 17-239 (2d Cir.). As the Seventh Circuit held in *Hecker*, because revenue sharing is derived from a fixed expense ratio, it does not increase the overall cost of an investment and thus is *immaterial* to participants. 556 F.3d at 585-86. Rather, "[t]he total [investment] fee" before any revenue sharing "is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment[.]" *Id.*; *see also Renfro*, 671 F.3d at 327-28.[41] Amounts allocated to TIAA and Vanguard for recordkeeping services were derived entirely from the Plan's already low expense ratios. Thus, plaintiffs advocate the untenable position that even if the total amount they paid for their investments was reasonable, Wash U somehow acted unlawfully because of the way TIAA and Vanguard chose to allocate those amounts after the fact between their investment and recordkeeping entities.

Indeed, forcing fiduciaries to abandon an asset-based arrangement in favor of a per-participant fee is not necessarily better for participants. As the *Loomis* court pointed out, "it isn't clear why participants would view a [flat] fee as a gain. A flat-fee structure might be beneficial for participants with the largest balances, but, for younger employees and others with small investment balances, a [flat] fee could work out to be more, per dollar under management, than a fee between 0.03% and 0.96% of the account balance." *Loomis*, 658 F.3d at 672; *see also White*, 2016 WL 4502808, at *14 (recognizing that asset-based revenue sharing "frequently inure[s] to the benefit of ERISA plans"); *Sweda*, 2017 WL 4179752, at *8 (dismissing similar claims). Unsurprisingly, neither ERISA nor the courts mandate any particular approach.[42]

---

[41] For the same reasons, the Court should reject plaintiffs' attempt to parse TIAA's annuity offerings into different "layers" of fees. Compl. ¶¶ 35-36; *see Sacerdote*, 2017 WL 3701482, at *11 (dismissing the same theory where, as here, plaintiffs did not allege "that the inclusion of investment products with these fees led to higher fees overall" in NYU's 403(b) plan).

[42] The Court should also disregard plaintiffs' unsupported, blanket allegation that the only reasonable recordkeeping fee was below $35 per participant over a more than six-year period. Compl. ¶ 61. Not only do plaintiffs fail to cite facts sustaining this conclusion, their other allegations belie it. For example, the Notre Dame 403(b) plan—which plaintiffs hold out as a prudent comparator—negotiated a flat fee of $60 per participant in 2015, after making the same types of changes plaintiffs advocate here. *See* Ex. W, Notre Dame 403(b) Plan Transition Guide, at 20 (2014), https://wpspreview.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_Roth_FLY.pdf.

Plaintiffs' allegation that the Plan should have utilized a single recordkeeper fares no better.  Just as there is "no statute or regulation prohibiting a fiduciary from selecting funds from just one management company," *Hecker*, 556 F.3d at 586-87, there is no statute or regulation prohibiting fiduciaries from utilizing two recordkeepers, *see Sweda*, 2017 WL 4179752, at *8 (dismissing similar claim that the Penn plan imprudently uses both TIAA and Vanguard).  In any event, plaintiffs do not allege that anyone other than TIAA was even capable of recordkeeping the Plan's idiosyncratic TIAA-CREF annuity products (much less at what cost),[43] and the Plan's fees *still* compared favorably to those of other universities that moved to a single recordkeeper. *Supra* at p.13.  Regardless, even though nothing about the use of two recordkeepers suggests imprudence, the Complaint itself concedes that Wash U *did* consolidate to a single recordkeeper during the alleged class period, illustrating that it followed a prudent process.  *Cf. White*, 2016 WL 4502808, at *14 (citing the ongoing reduction of fees over the putative class period as "plausibl[y] suggest[ing] that defendants were monitoring recordkeeping fees").

### C.    Selecting Bundled Products And Services Is Not A Fiduciary Breach.

Plaintiffs also allege Wash U  breached its duties by agreeing to certain "bundling" arrangements, namely agreeing to include the CREF Stock Account and CREF Money Market Account in connection with offering the TIAA Traditional Annuity, and agreeing that TIAA and Vanguard would recordkeep their respective Plan investments.  Compl. ¶¶ 72-91.

These allegations are derivative of plaintiffs' other imprudence claims, but they are also deficient in their own right.  The Eighth Circuit has held that similar arrangements are commonplace and can be prudent.  *See Tussey*, 746 F.3d at 336.  The plans at issue in both *Renfro* and *Hecker* involved more extensive bundled structures whereby a single provider,

---

[43] Further, the Complaint contains no factual allegations regarding the actual services TIAA or Vanguard provided, or how they compare to services provided to other 403(b) plans "of like character and with like aims."  29 U.S.C. § 1104(a)(1)(B); *see also Hecker*, 569 F.3d at 711 ("[T]he complaint is silent about the services . . . participants received."); *cf. Young v. Gen. Motors Inv't Mgmt. Corp.*, 325 F. App'x 31, *33 (2d Cir. 2009) (plaintiff "fail[ed] to allege that the fees were excessive relative to the actual 'services rendered'" or were "'so disproportionately large that [they] [bore] no reasonable relationship to the services rendered'") (citation omitted).

Fidelity, supplied the plans with its own proprietary investment options and also served as the sole recordkeeper for those options. *Renfro*, 671 F.3d at 318; *Hecker*, 556 F.3d at 579. Neither the Third nor Seventh Circuit found fault with these arrangements; rather, "many prudent investors limit themselves to funds offered by one company and diversify within the available investment options," and nothing in ERISA requires "fiduciaries to include any particular mix of investment vehicles in their plan." *Hecker*, 556 F.3d at 586. Recently, the *Sweda* court endorsed precisely the same plan structure at issue here, where Penn's 403(b) plan *continues* to use both TIAA and Vanguard. 2017 WL 4179752, at *8 ("Bundling of services is not inconsistent with lawful, free market behavior in the best interests of those involved, including beneficiaries.").

By the same token, offering the TIAA Traditional Annuity in conjunction with the CREF Stock Account and Money Market Account in no way suggests defendants failed to prudently monitor those options. While plaintiffs attempt to show otherwise by alleging that the Stock Account was an "underperformer," as demonstrated below, it continuously performed in-line with its benchmark over the alleged class period. *Infra* at pp.19-21. Meanwhile, the Traditional Annuity provided extraordinary returns throughout the alleged class period, *see infra* at pp.22-23, and plaintiffs take no take issue at all with the Money Market Account's performance. *See Sweda*, 2017 WL 4179752, at *7-8; *Sacerdote*, 2017 WL 3701482, at*7-8.

**D.    Plaintiffs' "Underperformance" Allegations Fail To State A Plausible Claim.**

Plaintiffs next assert that two of the Plans' more than 100 options were imprudent due to "underperformance": the CREF Stock Account and TIAA Real Estate Account. Compl. ¶¶ 195-206. Even if these funds "underperformed" (they did not), Wash U's investment decisions are entitled to deference, *Tussey*, 746 F.3d at 338, and "[p]oor performance, standing alone, is not sufficient to create a reasonable inference that plan administrators failed to conduct an adequate investigation[,]" *White*, 2016 WL 4502808, at *17; *see also Sweda*, 2017 WL 4179752, at *10 ("[T]here is no cause of action in ERISA for 'underperforming funds.'"). Plaintiffs must plausibly show the decision to offer the challenged investments was the result of a flawed

process, whereas a prudent process would have led to a different decision.  *See Meiners*, 2017 WL 2303968, at *2 ("The rate of return for the Wells Fargo and Vanguard funds are only relevant insofar as they suggest that Wells Fargo's decision making process was flawed.").  As the Eighth Circuit explained, "While it is easy to pick an investment option in retrospect (buy Apple at $7 a share in December 2000 and short Enron at $90 a share), selecting an investment beforehand is difficult.  The Plan administrator deserves discretion to the extent its *ex ante* investment choices were reasonable given what it knew at the time."  *Tussey*, 746 F.3d at 338.

Plaintiffs make no effort to satisfy this standard, citing only alleged underperformance as informed by incorrect "benchmark" comparisons and 20/20 hindsight.  In dismissing identical claims against the University of Pennsylvania, the *Sweda* court observed that "[s]ophisticated investors and rank amateurs both look to buy low and sell high and wonder why they did not have clear enough vision to see the path for doing so early enough to make their fortunes.  Chagrin does not inexorably become a cause of action."  2017 WL 4179752, at *10.[44]  In any event, that plaintiffs challenge only two funds underscores that the fiduciary process is working.

### 1.    Plaintiffs' CREF Stock Account Allegations Fail.

Plaintiffs' specific challenge to the CREF Stock Account misses the mark.  As of March 2017, the CREF Stock Account held $117.8 *billion* in total assets, and it is one of the Plan's most popular options, belying any allegation that offering it was *per se* imprudent.[45]  Regardless, plaintiffs measure the CREF Stock Account's performance against "benchmarks" it was never designed to meet and other *non-annuity* mutual funds with different objectives.  *See, e.g.*, *Meiners*, 2017 WL 2303968, at *2-3 ("[A] comparison of the returns for two different funds is insufficient because 'funds . . . designed for different purposes . . . choose their investments

---

[44] *See also St. Vincent*, 712 F.3d at 721 ("[A]llegation[s] that an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA."); *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (three years of losses "is not evidence that [defendant] violated his fiduciary duty").

[45] *See* Ex. X, CREF Stock Acct. (R3) Fact Sheet (as of June 30, 2017), https://www.tiaa.org/public/pdf/ffs/194408126.pdf; Ex. E, 2016 Form 5500, Sched. H, line 4i.  *See also In re Unisys Savings Plan Litig.*, 173 F.3d 145, 154 (3d Cir. 1999) (fiduciaries acted prudently where they considered, *inter alia*, that "other well-known pension plans purchased" the challenged investments).

differently, so there is no reason to expect them to make similar returns over any given span of time.'") (quoting *Tussey v. ABB, Inc.*, 850 F.3d 951, 960 (8th Cir. 2017)).

The Stock Account's prospectus shows that its performance benchmark "is a composite index that is a weighted average of two unmanaged indices," namely (1) the Russell 3000 Index (domestic equities) and (2) the MSCI ACWI ex-USA IMI index (foreign equities).[46]  The reason is simple:  the Stock Account invests in a combination of both *domestic* and *foreign* equities, and the composite index reflects that strategy.  Plaintiffs ignore this, instead comparing the Stock Account to one part of the benchmark, the Russell 3000 Index, which holds *only* domestic equities.  Compl. ¶ 121.  But the Stock Account has, in fact, tracked its actual benchmark:[47]

| Performance | | | | | | |
|---|---|---|---|---|---|---|
| | **Total Return** | | **Average Annual Total Return³** | | | |
| | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years |
| CREF Stock Account | 3.91% | 10.93% | 19.19% | 6.47% | 12.17% | 5.24% |
| CREF Composite Benchmark | 3.86% | 10.54% | 19.17% | 6.72% | 12.50% | 5.48% |
| Russell 3000 Index | 3.02% | 8.93% | 18.51% | 9.10% | 14.58% | 7.26% |
| Morningstar Large Blend Average | 2.92% | 8.65% | 17.17% | 7.60% | 13.35% | 6.21% |

Moreover, even comparing the Stock Account to the Morningstar "Large Blend Average" is misplaced given the fund's unique investment strategy and annuity features.  To this point, Morningstar recently re-classified the Stock Account to the "Allocation–85%+ Equity" category, and when compared to a more appropriate group of funds, the Stock Account has outperformed over *all* periods and receives an overall rating of four out of five stars from Morningstar.[48]

The Court should also reject plaintiffs' attempt to compare the Stock Account, a variable annuity, to Vanguard mutual funds (many of which were also available).  Compl. ¶¶ 115-18.  Aside from having different objectives, anyone who selected a mutual fund would incur costs if they desire to annuitize their savings at retirement and ensure a lifetime income.  Plaintiffs

---

[46] Ex. X, CREF Stock Acct. (R3) Fact Sheet, at 2.

[47] Ex. X, CREF Stock Acct. (R3) Fact Sheet, at 2.

[48] *See* Financial Times, Quote: CREF Stock Account Class R3, "Summary" and "Ratings" tabs, https://markets.ft.com/data/funds/tearsheet/ratings?s=QCSTIX (last visited Oct. 4, 2017).

cannot state a viable claim simply by cherry-picking a handful of inapposite comparators, citing "underperformance" (despite consistent *gains* over time), and calling it "imprudence."  *See Tussey*, 850 F.3d at 960 n.8 ("Making [a] comparison [between two funds] would . . . imply a (mistaken) view that whichever fund earned more over the relevant time frame 'should' have been offered to the participants, or even that it performed 'better' in a meaningful sense.").

### 2.     Plaintiffs' Challenge To The TIAA Real Estate Account Fails.

Plaintiffs' challenge to the Real Estate Account ("REA") is equally flawed.  Plaintiffs compare the REA to the Vanguard REIT Index Fund—which they concede is *also* available in the Plan.  Compl. ¶ 138.  But the two options are not comparable; indeed, they are different products altogether:  the REA is a separate account annuity product, while the Vanguard option is a mutual fund.  They have different strategies:  the REA buys and sells *actual* real estate, often as the sole owner, with a target of holding 75% to 85% of its assets in direct ownership interests in commercial properties.[49]  By contrast, the Vanguard option invests only in a conglomeration of publicly-traded REITs—and unlike the REA, its performance "may not correspond to returns from direct property ownership."[50]  In short, plaintiffs' challenge to the REA depends implausibly on a comparison between two investments having little in common beyond the term "real estate."  *See Tibble*, 729 F.3d at 1134 (rejecting "apples-to-oranges" comparison between a separate account investment and a mutual fund); *Meiners*, 2017 WL 2303968, at *2-3.

Regardless, the Real Estate Account outperformed the Vanguard REIT Index in three of the last six years, while offering far less volatility from year to year, a value-add in its own right:

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| TIAA Real Estate Account[51] | **12.99** | 10.06 | **9.65** | 12.22 | **8.16** | 5.20 |
| Vanguard REIT Index[52] | 8.70 | **17.65** | 2.48 | **30.28** | 2.45 | **8.34** |

---

[49] Ex. Y, TIAA Real Estate Acct. Prospectus ("Real Estate Account Prospectus"), at 3-6 (May 1, 2017), https://www.tiaa.org/public/pdf/realestate_prosp.pdf.

[50] Ex. Z, Vanguard REIT Index Fund Prospectus ("Vanguard REIT Prospectus"), at 1-2, 9 (Sept. 26, 2017), https://personal.vanguard.com/pub/Pdf/i3123.pdf?2210120737.

[51] *See* Ex. Y, TIAA Real Estate Account Prospectus at 11.

[52] *See* Ex. Z, Vanguard REIT Prospectus at 3.

If the Plan switched investment options based on short-term underperformance, each year it would have switched into an investment that underperformed the following year (all while depriving participants of the option to choose from both).  That is not what ERISA requires or participants want.  *See White,* 2016 WL 4502808, at \*17 ("A fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy."); *see also St. Vincent*, 712 F.3d at 721; *Jenkins*, 444 F.3d at 926.[53]

**E.      Plaintiffs' Challenge To The TIAA Traditional Annuity Fails.**

Plaintiffs also allege that offering the TIAA Traditional Annuity was a breach of fiduciary duty.  In particular, they claim a "surrender charge" of 2.5% to withdraw from that option, which could only occur over a ten-year period, "effectively den[ies] participants the ability to invest in equity funds and other investments."  Compl. ¶¶ 139-48.  But nothing in the Plan requires any participant to invest in the Traditional Annuity, and the conditions of doing so are well documented and fully disclosed to participants.[54]  Indeed, the Traditional Annuity is a *guaranteed* fixed annuity, the whole point of which is to purchase an amount of lifetime income based on the contractual rate schedules in effect when each premium (i.e., contribution) is paid.  The Traditional Annuity is, by design, "not a short-term savings vehicle," and these restrictions are precisely *why* TIAA can offer higher rates than alternatives without them.[55]

To that point, the Traditional Annuity contracts available in the Plan guarantee a minimum crediting rate of 3.0%—an undoubtedly valuable feature in the low interest-rate environment of the past decade—and often pay significantly more.  *Supra* at p.5.[56]  The liquidity restrictions assure TIAA will have the funds necessary to "invest a portion of its General

---

[53] In fact, the same report plaintiffs cite as critical of the CREF Stock Account (Compl. ¶ 120) recommended *buying* the TIAA Real Estate Account.  *See* AonHewitt, InBrief, *TIAA-CREF Asset Mgmt.* (July 2012), http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

[54] *See* Ex. F, 2016 404a-5 Fee Discl.; *see also* Ex. I, TIAA Trad. Annuity Fact Sheet, *supra* n.14.

[55] *See* Ex. I, Trad. Annuity Fact Sheet ("TIAA has rewarded participants who save in contracts where benefits are paid in installments over time instead of in an immediate lump sum by crediting higher interest rates, typically 0.50% to 0.75% higher.").

[56] *See* Ex. I, Trad. Annuity Fact Sheet (reflecting annual returns of 3.99%, 3.99%, 4.02%, and 4.29%, over the last 1, 3, 5 and 10 years, respectively).

Account portfolio in long-term assets that have the potential to contribute to the General Account's growth and to the financial strength and stability that back the TIAA Traditional Annuity's guaranteed returns."[57]   In fact, the Plan's Fee Disclosures explain precisely this point, describing both a Group Retirement Annuity (GRA) contract (with a withdrawal restriction) *and* a Group Supplemental Retirement Annuity (GSRA) contract.  Although the GSRA option allows for "lump-sum withdrawals and transfers . . . without any restrictions or charges," it also provided a return of only 3.0%, as opposed to the better 3.75% credited to the GRA option.[58]

The Complaint points to no other guaranteed annuity product unencumbered by similar restrictions or fees.  And even if it did, a fiduciary's decision to offer participants a higher guaranteed rate, in exchange for some restrictions, is well within the range of reasonable decisions a prudent fiduciary can make—particularly where, as here, the Traditional Annuity is by far the most popular Plan option, holding over $1 billion of the Plan's assets.[59] *See Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) ("ERISA does not impose a duty to take any particular course of action if another approach seems preferable.").

## II.     Plaintiffs' Prohibited Transaction Claims Fail As A Matter Of Law.

In Counts III and IV, plaintiffs allege two "prohibited transaction" claims, each attacking TIAA's participant loan program.  Compl. ¶¶ 207-20 (relying on 29 U.S.C. § 1106(a)(1)(B) and (D)).  Neither has merit.  To start, the Complaint does not include *any* factual allegations about the TIAA loan program.  There is a lone mention of loans in one paragraph, stating in conclusory fashion only that TIAA's program "required excessive collateral as security for repayment of the loan, charged grossly excessive fees for administration of the loan, and violated [DOL] rules for participant loan programs."  *Id.* ¶ 10.  Missing, however, are any facts about *how* the TIAA loan program works, *why* it would be inappropriate, what the supposedly "grossly excessive fees"

---

[57] Ex. AA, TIAA, *TIAA Traditional Annuity: Adding Safety and Stability to Retirement Portfolios*, at 4 (Apr. 2017), https://www.tiaa.org/public/pdf/compliance/tiaa-traditional-white-paper.pdf.

[58] Ex. F, 2016 404a-5 Fee Discl. at 42-43; Ex. E, 2016 Form 5500, Fin. Stmt. Notes at 9 (showing GRA yields of 3.83% (2016) and 3.77% (2015), while the GSRA yield was 3.08% and 3.10% in the same years).

[59] *See* Ex. E, 2016 Form 5500 at Sched. H, line 4i Schedule of Assets.

were, why they should be deemed excessive (and as compared to what?), or any other foundation

for these conclusions.  Counts III and IV fail on this basis alone.  *See Iqbal*, 556 U.S. at 678.

Regardless, nothing about the TIAA loan program violates ERISA.  Count III claims that

Wash U caused the Plan to engage in a transaction constituting a "direct or indirect . . . lending

of money or other extension of credit between the plan and a party in interest."  29 U.S.C.

§ 1106(a)(1)(B).  Count IV similarly alleges that, because participants move some of their

accounts to the Plan's Traditional Annuity option "as security for repayment of a plan loan," this

represents a transfer of Plan assets *to TIAA*.  Compl. ¶¶ 218-19.  The claims also suggest TIAA's

receipt of compensation for administering this program, alone, is a prohibited transaction.  *Id.*

*First*, plaintiffs concede that participant loans are exempt from ERISA's prohibited

transactions under 29 U.S.C. § 1108(b)(1), and the related regulation, 29 C.F.R. § 2550.408b-1.

*See* Compl. ¶ 212.  This exemption has five requirements, only two of which are even arguably

implicated by the Complaint here: loans must "bear a reasonable rate of interest," and must "be

adequately secured."  *Id.*[60]  Plaintiffs do not challenge the interest rate charged to participants as

unreasonable.[61]  Nor do plaintiffs contend that participant loans are not "adequately secured"—to

the contrary, the Plan's requirement that participants provide collateral is a primary *basis* for

their claim.  Compl. ¶¶ 210, 218-19.  This is reason enough to reject these claims.

*Second*, nothing in the Complaint suggests that TIAA received anything other than

"adequate consideration" for its services, meaning the exemption in 29 U.S.C. § 1108(b)(17) also

applies.  Plaintiffs allege only that TIAA earns the "spread between the interest rate charged to

the participant for the loan and the interest paid by TIAA to the Plan participant through the

---

[60] The exemption also requires that loans (1) are available to all participants on a reasonably equivalent basis, (2) are not made available to highly compensated employees for larger amounts, and (3) are made in accordance with the provisions of the Plan.  29 U.S.C. § 1108(b)(1)(A)–(C).

[61] Nor can they.  The rate is indexed to the Moody's corporate bond yield average, which ranged from 3.28% to 5.22% since January 1, 2011.  *See* Ex. BB, TIAA, *Take a Loan*, https://www.tiaa.org/public/advisors/guidance/take-a-loan (last visited Oct. 4, 2017); Fed. Reserve Bank of St. Louis, *Economic Research: Moody's Seasoned AAA Corp. Bond Yield*, https://fred.stlouisfed.org/series/AAA (last visited Oct. 4, 2017).  TIAA's rate also is subject to state insurance laws.  *See, e.g.*, Mo. Code Regs. Ann. Tit. 20, § 400-1.090(2), 20 C.S.R. § 400-1.090(2) (defining maximum interest rate on policy loans).

Traditional Annuity."  Compl. ¶ 219.  But this does not benefit TIAA, so much as it benefits *participants*.  The assets serving as collateral are transferred to the Traditional Annuity to secure a loan a participant requests, from funds to which she would not otherwise have access.  And the participant earns a guaranteed return on that collateral during repayment.[62]

*Third*, plaintiffs seem to suggest that by transferring Plan funds to the Traditional Annuity as collateral, they somehow exit the Plan and are at TIAA's disposal.  Compl. ¶¶ 210, 218.  But ERISA *requires* that a participant loan be "adequately secured," 29 U.S.C. § 1108(b)(1)(E), to ensure that "loss of principal or interest will not result from the loan," 29 C.F.R. § 2550.408b-1(f)(1).  Holding collateral in the Traditional Annuity does just that.  The Traditional Annuity also is one of the Plan's many options, meaning the collateral no more leaves the Plan or grants TIAA unfettered use than does any other routine contribution to that option.  The collateral is not a transfer "to TIAA."  Counts III and IV fail to state a claim.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

---

[62] Moreover, participants taking small loans (the vast majority) will frequently pay *less* than under Vanguard's flat-fee structure.  *Supra* at p.9.  Take, for example, a participant who took a $2,000 loan on January 1, 2012, paying it back on time over five years, at an interest rate of 4.0%.  *Supra* at p.24, n. 61.  This individual would pay a total of $209.08 in interest on the loan, but will *receive* $171.87 on her $2,200 collateral (110% of the loan), assuming a minimum 3% guaranteed rate.  In total, then, she would pay no more than $37.21 for the loan.  Under Vanguard's program, however—the only other option under the Plan—she would pay an origination fee of either $50 or $75, then a $50 *annual* maintenance fee, for a total of $300-$325.  The TIAA loan program thus would have *saved* this participant at least $260 in total costs—and likely more given that the Traditional Annuity typically paid more than the guaranteed 3.0%.  (Calculations performed using Bankrate's publicly accessible loan calculator, available at http://www.bankrate.com/calculators/managing-debt/loan-calculator.aspx (last visited Oct. 4, 2017).)

Dated:  October 5, 2017

Respectfully submitted,

By:   /s/ *Deborah S. Davidson*

Christopher A. Smith
HUSCH BLACKWELL
The Plaza in Clayton
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel.: 314-480-1836
Fax: 314-480-1505
chris.smith@huschblackwell.com


*Counsel for Defendants Washington*
*University in St. Louis and Washington*
*University in St. Louis Board of Trustees*

Brian T. Ortelere (*pro hac vice*)
Jeremy P. Blumenfeld (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
Tel.:  215-963-5000
Fax:  215-963-5001
brian.ortelere@morganlewis.com
jeremy.blumenfeld@morganlewis.com

Deborah S. Davidson (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
Tel.: 312-324-1000
Fax: 312-324-1001
deborah.davidson@morganlewis.com
matthew.russell@morganlewis.com

## <u>CERTIFICATE OF SERVICE</u>

I, Deborah S. Davidson, hereby certify that, on October 5, 2017, I caused a true and correct copy of the foregoing *Memorandum of Law in Support of Defendants' Motion to Dismiss for Failure to State a Claim*, including the exhibits thereto, to be served Plaintiffs' counsel of record via the Court's ECF system.


*Deborah S. Davidson*
Deborah S. Davidson